UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

URBAN JUSTICE CENTER – SAFETY NET
PROJECT, et al.,

                                        Plaintiffs,

            -against-                                              24-CV-8221 (JGK)

THE CITY OF NEW YORK, et al.,

                                        Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER
TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Urban Justice Center –          National Homelessness          Beldock Levine & Hoffman
Safety Net Project              Law Center                     99 Park Ave., PH/26th Floor
40 Rector Street                1400 16th St, NW, Suite 425    New York, NY 10016
New York, NY 10006              Washington, D.C 20036          T: (212) 490-0400
T: (646) 602-5600               T: (202) 638-2535              E: info@blhny.com
E: snp@urbanjustice.org         E: info@homelesslaw.org

                        *Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 2

    I.      Unreasonable Seizures and Lack of Process ................................................... 2

    II.     Sweeps of Life-Sustaining Belongings and During Inclement Weather ................ 4

    III.    Violations of and Inadequacy of Written Policy .................................................. 5

        A.    The City's Failure to Store and Voucher Property .................................. 5

        B.    Inadequacy of City's Vouchering and Storage Policy ............................ 6

        C.    "Emergency" Sweeps ........................................................................ 7

    IV.    Ongoing Violations ......................................................................................... 8

LEGAL STANDARD ...................................................................................................... 9

DISCUSSION .............................................................................................................. 10

    I.      Irreparable Harm .......................................................................................... 10

        A.    Legal Standard ................................................................................ 10

        B.    Application ...................................................................................... 11

            1.    Constitutional Violations ...................................................... 11

            2.    Additional Injuries .............................................................. 11

            3.    Likelihood of Irreparable Harm ............................................ 13

    II.     Likelihood of Success on the Merits ............................................................... 13

        A.    Legal Standard ................................................................................ 13

        B.    Application ...................................................................................... 13

            1.    Procedural Due Process ....................................................... 14

                a.    Pre-Deprivation Notice and Hearing ............................ 14

                b.    Post-Deprivation Process .............................................. 16

            2.    Unreasonable Seizure .......................................................... 17

            3.    State-Created Danger .......................................................... 19

    III.    Balance of Equities and The Public Interest ..................................................... 20

        A.    Legal Standard ................................................................................ 20

        B.    Application ...................................................................................... 22

CONCLUSION ............................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bailey v. Pataki*, 708 F.3d 391 (2d Cir. 2013) ........................................................ 14, 16

*Banco San Juan Internacional, Inc. v. FRB of N.Y.*, 700 F. Supp. 3d 86 (S.D.N.Y. 2023) . 9, 10, 21

*Basel Soukaneh v. Andrzejewski*, 112 F.4th 107 (2d Cir. 2024) .................................... 17

*Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167 (2d Cir. 2022) ..................... 10, 13, 21, 22

*Buckingham Corp. v. Karp*, 762 F.2d 257 (2d Cir. 1985) ............................................. 9

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30 (2d Cir. 2010) ................................................................................................... 21

*Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226 (2d Cir. 2004).............................. 11

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351 (2d Cir. 2024) ........................................................................................................... 10

*Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993) ............................................ 19

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) ................ 10

*Fund for Empowerment v. City of Phoenix*, 646 F. Supp. 3d 1117 (D. Ari. 2022) ............... 12, 19

*Gallagher v. New York State Board of Elections,* 477 F. Supp. 3d 19 (S.D.N.Y 2020)................. 9

*Garcia v. City of L.A.*, 11 F.4th 1113 (9th Cir. 2021) ................................................ 18

*Goldstein v. Hochul*, 680 F. Supp. 3d 370 (2d Cir. 2023) ........................................... 9

*Havens v. James*, 76 F.4th 103 (2d Cir. 2023)........................................................ 9, 21

*JLM Couture, Inc. v. Gutman*, 91 F.4th 91 (2d Cir. 2024) ........................................ 13

*Kincaid v. City of Fresno*, 2006 WL 3542732 (E.D. Cal. 2006) .............................. 16, 17

*Lavan v. City of L.A.*, 693 F.3d 1022 (9th Cir. 2012) .......................................... 14, 16, 18

*Lavan v. City of L.A.*, 797 F. Supp. 2d 1005 (C.D. Cal. 2011) .................................... 17

*Libertarian Party v. Lamont*, 977 F.3d 173 (2d Cir. 2020) ........................................ 10

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n*, 965 F.2d 1224 (2d Cir. 1992) ... 9

*Lynch v. City of New York*, 589 F.3d 94 (2d Cir. 2009) ............................................. 21

*Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020) ....................... 11

*Mitchell v. City of Los Angeles*, 2016 WL 11519288 (C.D. Cal. 2016) ...................... 16, 18, 19

*New York State NOW v. Terry*, 697 F. Supp. 1324 (S.D.N.Y. 1988) ............................ 9

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020)................... 10

*Pena v. DePrisco*, 432 F.3d 98 (2d. Cir. 2005) ...................................................... 19

*Pottinger v. City of Miami,* 810 F. Supp. 1551 (S.D. Fla. 1992)................................... 18

*Pottinger v. Miami,* 810 F. Supp. 1551 (S.D. Fla. 1992) ........................................... 17

*Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir. 990) ........................... 10

*Sacramento Homeless Union v. County of Sacramento*, 617 F. Supp. 3d 1179 (E.D. Cal. 2022) 20

*Soldal v. Cook County, Ill.*, 506 U.S. 56 (1992)..........................................................................17

*UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 760 F. Supp. 2d 373 (S.D.N.Y. 2011)....................13

*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993)......................................14

*Yang v. Kellner,* 458 F. Supp. 3d 199 (S.D.N.Y. 2020) ........................................................... 9

*Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020) ......................................................................22

**Statutes**

N.Y. Gen. Constr. Law, § 39 ...................................................................................................14

## PRELIMINARY STATEMENT

Thousands of times per year, without meaningful notice, the City of New York ("the City") seizes homeless New Yorkers' personal belongings—including medications, mobility devices, documentation needed for public benefits, warm clothing, and blankets—and destroys them, leaving homeless New Yorkers destitute and without recourse. These homeless "sweeps" amount to government action that would be unthinkable in any other context, yet the City exacts it upon its most vulnerable residents as part of an official interagency policy or custom. That policy or custom devastates thousands of homeless New Yorkers every year, across all five boroughs, and violates their rights under the Fourth and Fourteenth Amendments as well as local laws. For over nine years, advocates have notified the City that this practice is inhumane and unlawful, yet the City has doubled down.

In this class action, Plaintiffs are homeless New Yorkers, and an organization who represents them, who are suing to end the City's unlawful policy and bring some stability to the lives of homeless New Yorkers. Here, Plaintiffs move for a Temporary Restraining Order and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs seek this emergency relief at this juncture for several reasons. First, in the immediate aftermath of filing, two of the six individual Plaintiffs were swept. In the case of Bethany Hine, the City took all of her belongings, including her shoes. She has since tragically passed away. Second, with the passing of Proposition 2, the City has been given even greater latitude to conduct sweeps. And third, temperatures are dramatically dropping, making the confiscation of survival property even more life-threatening, as the annexed declarations from medical professionals demonstrate.

The relief sought here is less than the ultimate relief Plaintiffs seek, and is narrowly tailored to prevent the worst irreparable harm that will be suffered by the class members absent an injunction, namely: enjoining Defendants from (1) conducting "cleanups" without a minimum

amount of 14 days' notice as to the specific date and time of a "cleanup"; (2) seizing homeless residents' personal belongings, even if unattended, during a "cleanup"; (3) permanently depriving homeless residents of their personal belongings, even if unattended, during a "cleanup"; and (4) conducting a "cleanup" during inclement weather.

## **FACTUAL BACKGROUND**

For a full recitation of the facts, Plaintiffs respectfully refer the Court to the Complaint. (Class Action Complaint, Dkt. 1 ("Compl.").)  In addition to the allegations in the complaint, the urgency of an injunction is demonstrated by the annexed declarations of eleven homeless New Yorkers, two staff members of the Urban Justice Center Safety Net Project ("UJC-SNP") who have witnessed and worked with dozens of homeless New Yorkers, five mutual aid volunteers who have witnessed over eighty sweeps, two medical practitioners who speak to the impact of sweeps on the health and wellbeing of homeless New Yorkers, and the former executive director of a homeless-led advocacy organization.  The declarations demonstrate that Defendants conduct over 4,000 homeless sweeps every year.  During these sweeps, Defendants almost always seize and destroy homeless people's property without providing adequate or any notice the property will be seized or any opportunity to reclaim the property after it is taken; deprive people of their life-sustaining belongings, such as medications and blankets; conduct sweeps in inclement weather, forcing homeless residents to leave sites where they have sought shelter; and this conduct is causing the individual Plaintiffs and putative class members irreparable harm.

## I.   UNREASONABLE SEIZURES AND LACK OF PROCESS

The City has a policy or custom of seizing and destroying the personal belongings of homeless residents during sweeps, including family photographs, personal identification documents, medications, artwork, blankets, and clothing.  During sweeps, the City routinely seizes homeless people's belongings, throws them in a garbage truck, and crushes them, permanently

depriving residents of their property. (*E.g.*, Bethel Decl. ("Bethel"), Ex. 9, ¶¶ 17–19; Chapman Decl. ("Chapman"), Ex. 23, ¶¶ 17–18; Cruz Aragón Decl. ("Cruz Aragón"), Ex. 11, ¶¶ 10–14; Hayes Decl. ("Hayes"), Ex. 2, ¶¶ 11–19; Gonzalez Decl. ("Gonzalez"), Ex. 7, ¶¶ 22–30; Grey Decl. ("Grey"), Ex. 13, ¶¶ 15, 18–21; Hine Decl. ("Hine"), Ex. 3, ¶¶ 6, 9–10, 22; Kim Decl. ("Kim"), Ex. 21, ¶¶ 9, 12–13; Laverpool Decl, Ex. 5 ("Laverpool"), ¶¶ 9–13; Ludemann Decl. ("Ludemann"), Ex. 6, ¶¶ 14–16, 19; Mendez Montejo Decl. ("Mendez Montejo"), Ex. 22, ¶¶ 10–13; Penzlien Decl. ("Penzlien"), Ex. 12, ¶¶ 14–16); Rastogi Decl. ("Rastogi"), Ex. 1, ¶¶ 13–17; Strom Decl. ("Strom"), Ex. 10, ¶¶ 27, 29; Ventura Decl. ("Ventura"), Ex. 8, ¶¶ 18–21; Voorhees Decl. ("Voorhees"), Ex. 4, ¶¶ 13–16, 21, 31, 33.[1]) The City often instructs homeless residents to leave their sites and take only what they can carry with their own two hands in a single trip before summarily disposing of their belongings. (*E.g.*, Bethel ¶¶ 14, 18–19; Chapman ¶¶ 17–18; Hayes ¶ 8; Gonzalez ¶¶ 20, 25, 30; Kim ¶ 9; Ludemann ¶¶ 11, 14; Rastogi ¶ 18; Ventura ¶ 15; Voorhees ¶ 11; Strom ¶ 25; Grey ¶ 16; Penzlien ¶ 23.) The City generally does this without accommodating people's individual circumstances, including physical and mental limitations, and, in many cases, prohibits others from helping transport belongings. (*E.g.*, Gonzalez ¶ 25; Hine ¶ 5; Rastogi ¶ 18.) Other times, interagency sweeps teams seize property while homeless residents are still packing up and relocating, and restrict items people can bring with them. (*E.g.*, Gonzalez ¶¶ 23, 29; Kim ¶ 10; Rastogi ¶ 19; Ventura ¶¶ 17–18, 27; Voorhees ¶¶ 12, 31.) The City regularly seizes and destroys homeless residents' belongings while they are temporarily absent from their sites. (*E.g.*, Gonzalez ¶¶ 26–27; Grey ¶¶ 14–15; Hine ¶ 14; Kim ¶ 18; Laverpool ¶ 16; Mendez Montejo ¶ 11; Penzlien ¶¶ 18, 28; Rastogi ¶¶ 24–25; Strom ¶ 31; Ventura ¶¶ 28–29; Voorhees ¶ 34.)

---

[1] All exhibits appended to Declaration of Keegan Stephan.

The City routinely conducts "emergency" sweeps without advance written notice (*E.g.*, Bethel ¶¶ 13–14, 18–19, 21; Chapman ¶¶ 12–13, 17–18; Cruz Aragón ¶ 6; Hayes ¶¶ 5, 12–17; Mendez Montejo ¶ 8; Grey ¶ 7; Penzlien ¶ 10; Rastogi ¶¶ 10–11; Strom ¶ 23; Ventura ¶¶ 11, 25–27; Voorhees ¶¶ 6, 18–21, 33) and frequently provides insufficient, inconsistent, and incorrect notice prior to sweeps, never providing 14 days' notice, as required by policy (Druce Decl. ("Druce"), Ex. 20, ¶ 6, Ex A ("Sweeps Policy"), sec. C; *e.g.*, Bethel ¶¶ 10–12; Chapman ¶¶ 10-11; Cruz Aragón ¶¶ 7, 9; Mendez Montejo ¶¶ 8–9; Gonzalez ¶ 14; Grey ¶¶ 9–11; Penzlien ¶ 9; Hayes ¶¶ 6–7, 18; Rastogi ¶¶ 7–9; Strom ¶ 22; Ventura ¶¶ 9–10; Voorhees ¶¶ 7, 17; Hine ¶¶ 10-14.) This devastates homeless New Yorkers' ability to safeguard their personal belongings during sweeps and reclaim their belongings after. (*E.g.*, Hayes ¶ 6; Gonzalez ¶¶ 16, 19; Grey ¶ 12; Penzlien ¶¶ 11–13; Rastogi ¶ 12; Strom ¶ 24.) Moreover, the City does not provide a mechanism for contesting sweeps or any kind of pre- or post-deprivation hearing. (Cruz Aragón ¶ 7; Gonzalez ¶¶ 29–30; Grey ¶¶ 24; Penzlien ¶¶ 24; Strom ¶¶ 25–26; Ventura ¶ 21; Voorhees ¶¶ 11–12.)

## II. SWEEPS OF LIFE-SUSTAINING BELONGINGS AND DURING INCLEMENT WEATHER

The City permanently deprives homeless residents of their survival belongings during sweeps, including items that protect them from the elements (such as blankets, warm jackets, tarpaulins, and umbrellas), medications, medical devices, and personal documentation needed to access services, including purchasing food. (*E.g.*, Bethel ¶¶ 17–18; Chapman ¶¶ 17–18; Cruz Aragón ¶ 14; Gonzalez ¶¶ 23, 36; Grey ¶¶ 14, 18; Hayes ¶ 18-19; Hine ¶ 16, 19; Kim ¶ 13; Laverpool ¶¶ 9, 13, 16; Ludemann ¶ 15; Mendez Montejo ¶ 12; Penzlien ¶ 15; Shi Decl. ("Shi"), Ex. 17, ¶ 6; Strom ¶¶ 25(b), 27; Rastogi ¶ 29; Ventura ¶¶ 20, 26–27, 31; Voorhees ¶¶ 9, 14, 35) Specifically, the City took Plaintiff Antonia Hayes's Electronic Benefits Transfer ("EBT") card, Bethany Hine's prescription cream for a skin condition and hormones, one homeless declarant's

antibiotics, and two others' wheelchairs, walkers, and canes.  (Hayes ¶ 19; Hine ¶¶ 10, 16, 22; Kim ¶ 14; Laverpool ¶¶ 9–10; Ludemann ¶ 15.)   The City also regularly conducts sweeps during inclement weather, including rain, snow, extreme heat, and freezing temperatures, depriving homeless residents of items they use to survive.  (*E.g.,* Rastogi ¶ 26; Hine ¶ 19; Voorhees ¶ 35; Bethel ¶ 23; Chapman ¶ 23; Penzlien ¶¶ 21, 26; Strom ¶ 32.)  Once, the City displaced homeless migrants during a flash flood.  (Strom ¶ 32(a).)

## III.   VIOLATIONS OF AND INADEQUACY OF WRITTEN POLICY

### A.    The City's Failure to Store and Voucher Property

The City's primary written policy on sweeps ("DHS Sweeps Policy"), promulgated by the Department of Homeless Services ("DHS"), requires the City to voucher homeless residents' "eligible" property during sweeps and store it for 90 days.  (Compl. ¶¶ 87–91; Sweeps Policy" at 4–7, sec. D.)  The storage system set out in the policy involves inventorying items, placing them in labeled containers, providing residents with vouchers, and transporting them to a storage unit. (Compl. ¶¶ 87–91; Sweeps Policy" at 4–7, sec. D.)  When a resident is absent, the policy imposes storage and notice obligations, including requiring DHS to "make reasonable efforts" to identify any eligible items and store them for up to 90 days.  (Compl. ¶¶ 87–91; Sweeps Policy" at 4–7, sec. D.)

The City, however, almost never vouchers or stores homeless people's property during sweeps.  (*E.g.*, Compl. ¶ 96; Bethel ¶¶ 19–20; Chapman ¶¶ 18, 21; Gonzalez ¶ 33; Hayes ¶ 20; Hine ¶¶ 20–22; Rastogi ¶¶ 21–23; Strom ¶¶ 25, 28; Ventura ¶¶ 21–22; Voorhees ¶ 26–27.)  Indeed, the City has stated it has no records relating to the creation or maintenance of a voucher or storage system.  (Druce ¶ 5.)  Of the over 100 sweeps witnessed by declarants, the City offered storage only three times—once in the context of a shelter placement and another where declarant was informed residents could only retrieve their belongings upon offering proof of housing or an

independent storage unit.[2]  (Rastogi ¶ 23; Penzlien ¶ 21.)  Only two homeless declarants recall being offered storage—both have experienced 50–100 sweeps and been offered storage only three times, each time by NYPD and not DHS, without any real means of retrieving their belongings. (Kim ¶ 8; Voorhees ¶¶ 16, 26–27.)  In addition, DHS does not provide homeless residents with assistance applying for a Human Resources Administration ("HRA") storage grant, as required by policy.  (*E.g.*, Kim ¶¶ 16–17; Strom ¶ 28; Ventura ¶ 22; Voorhees ¶ 10.)  Instead, the City summarily destroys homeless residents' belongings, as described above.  In cases where residents are absent, the evidence shows the City immediately disposes of personal belongings without any attempt to identify "eligible" property.  (*See supra* Subsection I.)

### B.    Inadequacy of City's Vouchering and Storage Policy

Even if the City complied with its policy, it deems many storable belongings "ineligible," contemplating disposal, and does not provide homeless residents with a meaningful way to retrieve personal belongings.  The policy does not require DHS to inform residents of the location of the storage unit.  Residents would be required to coordinate pick-up by phone, which means they must have access to a working phone.  (Compl. ¶¶ 91; Sweeps Policy at 7, sec. D(5).)  The sample voucher attached to the policy also states residents are required to present "proper identification" at pick up.  (Compl. ¶¶ 91; Sweeps Policy, Attachment DHS-123.)  Many homeless residents do not have phones or identification and both are commonly seized during sweeps.  (Gonzalez ¶ 37; Grey ¶ 19; Hartman Decl. ("Hartman"), Ex. 14, ¶ 11; Mendez Montejo ¶ 13; Strom ¶¶ 12–13, 29; Lewis Decl. ("Lewis"), Ex. 16, ¶¶ 11, 16; Ventura ¶¶ 20, 29-30; Voorhees ¶ 15.)   Personal

---

[2] Three other times, the City transported a resident's belongings to a storage unit obtained independently of the City.  (Gonzalez ¶ 32; Grey ¶ 23; Penzlien ¶ 20; Rastogi ¶ 22.)

identification is especially hard for homeless residents to replace.  (*Id*.)  The policy does not require the City to offer transportation to storage.  (Sweeps Policy at 4–7, sec. D.)  Moreover, sweeps prevent homeless residents from leaving their site and traveling to a storage unit because of the threat the City will arrive unannounced and throw out their belongings while they are gone.  (Grey ¶ 26; Voorhees ¶ 25; Bethel ¶ 26; Cruz Aragón ¶ 8; Chapman ¶ 26.)  The storage process proposed by DHS is, even if properly implemented, unworkable.

C.    **"Emergency" Sweeps**

The Sweeps Policy lists broad criteria the City can rely on to conduct "emergency cleanups" without notice.  These include sites located in a "high-traffic area," which the policy doesn't define, and where sweeps are requested by a "Commissioner-level City official or above." (Compl. ¶ 91; Sweeps Policy at 3, sec. B.)

The City routinely conducts no-notice sweeps of sites that fall outside the scope of that criteria.  Plaintiffs Bethel and Chapman experienced weekly no-notice sweeps for months because the City deemed them "chronically homeless."  (Bethel ¶¶ 7, 9, 18; Chapman ¶¶ 6, 9.)  Plaintiff Voorhees was told the City conducted no-notice sweeps of his site five days in a row because he was residing in an area where people like to take photos.  (Voorhees ¶ 21.)  An SNP staff member witnessed a sweep take place without notice because the City described the site as a "landmark." (Strom ¶ 25.)  Another declarant observed a no-notice sweep where the stated "emergency" was cold weather, but during which the City seized survival belongings.  (Penzlien ¶ 21.)  Further, City representatives have told several declarants that they believe notice is simply a "courtesy." (Rastogi ¶ 11; Strom ¶ 33.)  Declarants report an increased number of no-notice sweeps in recent months.  (Bethel ¶ 13; Chapman ¶ 12–13; Hayes ¶ 13; Grey ¶ 7; Rastogi ¶ 10; Strom ¶ 23; Voorhees ¶ 19.)

## IV.    ONGOING VIOLATIONS

Several Plaintiffs were swept by the City shortly after the Complaint in this lawsuit was filed.  Bethany Hine was swept by an interagency sweeps team, two days after filing, and the City seized and destroyed all of her belongings, including her shoes, leaving her barefoot in the street. (Hine ¶ 22.)  Plaintiff Voorhees was swept and forced to relocate to a less secure site the day of and day after filing.  (Voorhees ¶¶ 33, 38–39.)  UJC-SNP staff attended several sweeps since filing, including two on rainy days with the City seizing items necessary to protect against the elements, including tarps and blankets, at one.  (Gonzalez ¶ 45; Strom ¶ 32(b).)  Clearly, despite this lawsuit, homeless residents are at serious risk of being continually swept and being permanently deprived of their belongings.

Winter is here, with DHS already declaring numerous Code Blue nights since November 29, 2024.  The City has a pattern of conducting sweeps during inclement weather, depriving homeless residents of belongings they need to protect themselves from the elements, and displacing them from sites where they have sought shelter i.e., under scaffolding or overpasses. (*Supra* Subsection II.)  In some cases, the City conducts sweeps of the same individuals and sites on a weekly basis or across consecutive days.  (*See e.g.*, Bethel ¶ 9; Chapman ¶ 9; Hartman ¶ 6; Gonzalez ¶ 21; Strom ¶ 34; Voorhees ¶¶ 18–19.)  Given the City's repeated practice of permanently seizing and destroying residents' survival items, homeless residents will inevitably suffer imminent and irreparable harm—threats to their very health and survival—if the Court does not grant immediate relief.

Moreover, the recent passage of Proposition 2 in November 2024, which empowers DSNY to conduct sweeps in public areas across the City where they did not previously have authority to, will likely increase the amount of sweeps in 2025.

Plaintiffs' only recourse for preserving their rights and preventing further irreparable harm

is a temporary restraining order and preliminary injunction.

## LEGAL STANDARD

"The purpose of a preliminary injunction is to protect the moving party from irreparable injury during the pendency of the action." *Buckingham Corp. v. Karp*, 762 F.2d 257, 261 (2d Cir. 1985). The same standard applies to temporary restraining orders and preliminary injunctions. *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228–29 (2d Cir. 1992). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Havens v. James*, 76 F.4th 103, 130 (2d Cir. 2023); *Banco San Juan Internacional, Inc. v. FRB of N.Y.*, 700 F. Supp. 3d 86, 96 (S.D.N.Y. 2023). The movant must demonstrate those elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

District courts have "wide discretion in determining whether to grant a preliminary injunction." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 388 (2d Cir. 2023). Moreover, district courts have the power to grant preliminary injunctive relief to classes not yet certified. *New York State NOW v. Terry*, 697 F. Supp. 1324, 1336 (S.D.N.Y. 1988), *aff'd as modified on other grounds*, 886 F.2d 1339 (2d Cir. 1989); *Gallagher v. New York State Board of Elections,* 477 F. Supp. 3d 19, 39 n.2 (S.D.N.Y 2020) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief." (citing Newberg on Class Actions)); *Yang v. Kellner,* 458 F. Supp. 3d 199, 218 n.5 (S.D.N.Y. 2020), *aff'd*, 805 Fed. Appx. 63 (2d Cir. 2020) ("The Court need not formally certify a class in order to issue the requested preliminary relief." (citing Newberg on Class Actions)). That is particularly true where—as here—there is an institutional plaintiff who would be entitled to the same relief as the putative class. *Terry*, 697 F. Supp. At 1336.

## DISCUSSION

### I.    IRREPARABLE HARM

#### A.    Legal Standard

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *Banco*, 700 F. Supp. 3d at 97.  "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). Movants are not required to prove irreparable harm is certain, but that they are "*likely* to suffer irreparable harm in the absence of preliminary relief." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (emphasis added); *see also Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 990) (likelihood of irreparable harm must be "probable").[3]

---

[3] A movant must make a "strong" showing of irreparable harm where "(i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Libertarian Party v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020).  The second reason does not apply because any injunctive relief could be lifted if Defendants prevail at trial. As to the first justification, the "status quo" is not the current state of affairs, but "the last actual, peaceable uncontested status which preceded the pending controversy." *Daileader*, 96 F.4th 356; *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 174 (2d Cir. 2022).  Here, Plaintiffs assert that this controversy has existed as long as the City has been conducting sweeps, thus Plaintiffs are not seeking to alter the status quo.  Regardless, Plaintiffs satisfy either standard.

The irreparable harm requirement is satisfied where—as here—plaintiffs allege deprivations of a constitutional right. *Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("the alleged violation of a constitutional right triggers a finding of irreparable injury"). Furthermore, in the case of an organizational plaintiff, conduct that causes a diversion of organizational resources and an irretrievable frustration of the organization's mission constitutes irreparable harm. *Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020).

### B.    Application

#### 1.    Constitutional Violations

Here, Plaintiffs allege widespread violations of the Fourth and Fourteenth Amendment. (*See* Compl. ¶¶ 136–290; *infra* Subsection II(B)(1)-(3).) Accordingly, Plaintiffs have adequately alleged constitutional violations sufficient to satisfy the irreparable harm requirement. *Conn. Dep't of Envtl. Prot.*, 356 F.3d at 231.

#### 2.    Additional Injuries

Furthermore, the individual Plaintiffs and class members are suffering additional irreparable harm. Many homeless people have had irreplaceable items unreasonably seized and destroyed. (*E.g.*, Bethel ¶¶ 17–18, 30; Hine ¶ 15; Laverpool ¶ 9; Ludemann ¶ 16.) Plaintiff Hayes, for example, lost the ashes and photographs of family members. (Hayes ¶ 18.).

Additionally, the City routinely seizes and destroys life-sustaining property, such as blankets, sleeping bags, tents, medication, warm clothing, and documentation necessary to obtain food and other services. Each of the individual Plaintiffs has been permanently deprived of survival belongings. (Bethel ¶¶ 17–20, 22; Chapman ¶¶ 17–18, 22; Hayes ¶¶ 14–21; Ventura ¶¶ 20–22, 26–27, 29; Voorhees ¶¶ 14–16, 18, 22, 31, 35.) Individuals who have supported homeless New Yorkers have witnessed the destruction of survival belongings during inclement

weather on many occasions.  (Gonzalez ¶¶ 23, 36, 45; Grey ¶ 18; Paul Decl. ("Paul"), Ex. 19, ¶¶ 12; Penzlien ¶¶ 15, 21; Rastogi ¶¶ 17, 26; Strom ¶¶ 29, 32.)  The confiscation of such life-sustaining items places homeless residents at serious risk and harms their mental and physical health.  (Shi ¶¶ 5-9; Isaacsohn Decl. ("Isaacsohn"), Ex. 15, ¶¶ 10–14.)  It also prevents them from obtaining employment, leaving their sites to get food, and accessing medical services.  (*E.g.*, Cruz Aragón ¶¶ 8, 13; Hayes ¶¶ 18–19; Shi ¶ 6.)  Courts have held such injuries satisfy the irreparable harm requirement.  *E.g.*, *Fund for Empowerment v. City of Phoenix*, 646 F. Supp. 3d 1117, 1131 (D. Ari. 2022) ("While it may often be the case that taking a tent, an article of clothing, or bedding, constitutes a chiefly economic injury, in this case … it may be taking everything the person owns."), *abrogated on other grounds*.  This is more urgent now given the decreasing temperatures and need for items like warm clothing and blankets.  In recent years, a higher number of homeless residents died between November and January.  For 2022–23, DHS and the Office of Chief Medical Examiner ("OCME") report 31 unsheltered deaths in November, 56 in December, and 39 in January—nearly double than for other months and up 89% from the year before.  *Eighteenth Annual Report on Deaths Among Persons Experiencing Homelessness (July 1, 2022-June 30, 2023)*, NYC Dept. Health & Mental Hygiene, & NYC Dept Homeless Servs. 1, 18 (2023).

The institutional Plaintiff, UJC-SNP, diverts significant resources to aiding homeless people who have been displaced and had their property seized and destroyed.  (Strom ¶¶ 8–14.)  Only recently, UJC-SNP diverted resources to replacing the survival belongings of homeless clients seized by the City during sweeps conducted after this lawsuit was filed.  (Strom ¶ 38.)  It has also been present at several sweeps since this lawsuit was filed to support homeless residents.  (Gonzalez ¶ 45; Strom ¶¶ 23, 32.)  This irretrievably frustrates UJC-SNP's mission because it is forced to redirect its focus from permanent housing and public benefits advocacy to responding to

the harms wrought by sweeps.  (Strom ¶¶ 8–14.)

### 3.    Likelihood of Irreparable Harm

Given the City is conducting hundreds of sweeps every month, most sweeps involve the unreasonable seizure of people's property, including life-sustaining property, and the City rarely, if ever, affords homeless people an opportunity to retrieve their seized property, Plaintiffs have made a strong showing they and all class members are likely to suffer imminent and irreparable harm if an injunction is not granted.

## II.    LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    Legal Standard

"[I]n determining whether a plaintiff has demonstrated a likelihood of success on the merits of the ultimate case, a court is not called upon finally to decide the merits of the controversy.  It is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief."  *UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 760 F. Supp. 2d 373, 377 (S.D.N.Y. 2011) (internal quotation marks omitted).[4]  Here, Plaintiffs satisfy this standard for each of the three claims discussed below.

### B.    Application

Defendants' conduct plainly violates numerous federal and state laws.  Here, Plaintiffs'

---

[4] As with irreparable harm, if the injunction will (1) disturb the status quo or (2) provide the plaintiff with all of the relief sought in a way that cannot be undone after litigation, a movant must meet a higher standard for this factor, as well—namely, "a clear or substantial likelihood of success on the merits."  *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 105 (2d Cir. 2024); *Bionpharma*, 582 F. Supp. 3d at 174.  As noted, neither of those justifications apply here.  Regardless, Plaintiffs satisfy either standard.

focus on the Fourteenth and Fourth Amendments.

### 1.    Procedural Due Process

The government cannot deprive a person of their personal property without providing adequate process. *Bailey v. Pataki*, 708 F.3d 391, 401 (2d Cir. 2013). At minimum, individuals should receive notice and an opportunity to be heard before the government deprives them of property. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993). Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of [property]." *Bailey*, 708 F.3d at 407. "[W]here the State is truly unable to anticipate and prevent a random deprivation," "a post-deprivation hearing might satisfy due process." *Id.* at 401.

Here, Plaintiffs and class members have a clear property interest in continued possession of their belongings—including temporarily unattended belongings. *E.g.,* N.Y. Gen. Constr. Law, § 39; *see also Lavan v. City of L.A.*, 693 F.3d 1022, 1031 (9th Cir. 2012) ("[T]his case concerns the most basic of property interests encompassed by the due process clause: Appellees' interest in the continued ownership of their personal possessions.") The deprivation of the individual Plaintiffs' and class members' property is not random. It is happening at most sweeps. (*See supra* Subsection I.) Accordingly, the City's deprivation of personal property is an integral—and anticipated—component of a sweep.

### a.    Pre-Deprivation Notice and Hearing

While the City offers notice prior to some sweeps, it routinely performs no-notice sweeps, depriving people of their property without any advance notice. (*See supra* Subsections I & III(c).) It does so pursuant to a list of "emergency" criteria that is so broad and vague as to allow unconstitutional discretion and permit the City to conduct no-notice sweeps where due process demands prior notice. (Compl. ¶ 81; Sweeps Policy at 3, sec. B(1).) Declarants have experienced and/or witnessed sweeps without any warning in situations where the deprivation of personal

property is clearly anticipated, including those that do not appear to satisfy the criteria listed in the written policy. i.e., Plaintiffs Bethel and Chapman were swept without notice on a weekly basis because they were deemed "chronically homeless." (Bethel ¶¶ 7, 9, 18; Chapman ¶¶ 6, 9; *see also* Voorhees ¶ 21; Strom ¶ 25; Penzlien ¶ 21.) And regardless of whether the policy authorizes no-notice sweeps, the policy cannot vitiate the requirement to provide notice before depriving a person of their property.

The City also regularly carries out sweeps on dates and at sites other than those listed on the notice, does not offer a time or window of time during which a sweep will take place, and posts notices only a few days—or indeed the night before, less than required by their own policy—a sweep is scheduled. (*E.g.*, Cruz Aragón ¶ 7; Gonzalez ¶¶ 13–14; Hayes ¶¶ 6–7; Laverpool ¶ 7; Penzlien ¶ 9; Rastogi ¶¶ 7–9; Strom ¶ 22; Voorhees ¶¶ 7, 30.) All these practices have a seriously detrimental impact on homeless residents' ability to safeguard their belongings and significantly exacerbates the risk the City will erroneously deprive homeless residents of their property. For example, residents have insufficient time to pack up their belongings before they are forcibly displaced or they are temporarily away from their site because they don't know a sweep is going to occur. (*E.g.*, Bethel ¶ 18; Cruz Aragón ¶ 8; Gonzalez ¶¶ 16, 18–19; Grey ¶ 12; Rastogi ¶ 12; Strom ¶ 24.) Accordingly, even when notice is given, it is constitutionally inadequate.

Furthermore, no homeless resident is ever afforded a hearing before their property is seized. The policy does not even call for one. (Compl. ¶ 77; Sweeps Policy at 2–7.) Consequently, homeless residents do not receive any meaningful opportunity to contest the deprivation of their belongings. (*See supra* Subsection I.) Instead, homeless residents are typically told to take what they can carry in a single trip, then the City destroys their remaining belongings. (*Id.*) Alternatively, if they are not present at their sites during the sweep, the City destroys everything.

(*Id.*)

Accordingly, the deprivation of homeless residents' property violates procedural due process. *See Lavan,* 693 F.3d at 1032 ("the government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking.")

### b.    Post-Deprivation Process

Even if it is found these deprivations are "random" and the City truly cannot anticipate them, they are still unconstitutional. At minimum, the City must provide some type of post-deprivation process for homeless people to recover their property. *Bailey*, 708 F.3d at 401. The City, however, is not doing that. The City does not offer any post-deprivation procedure to challenge the seizure or reclaim property. (*See supra* Subsections I and III(a).) It almost never vouchers and stores belongings, instead destroying them in garbage trucks. (*See supra* Subsections I and III(a).[5])

Accordingly, the deprivation of homeless residents' property violates procedural due process. *E.g.*, *Kincaid v. City of Fresno*, 2006 WL 3542732 *38 (E.D. Cal. 2006) ("[T]he City provides no post-deprivation remedy of any sort, as all property is summarily destroyed on the spot.") *Mitchell v. City of Los Angeles*, 2016 WL 11519288 *5 (C.D. Cal. 2016) (finding the City's procedures post-deprivation, including its storage system, did "not appear to afford the homeless a meaningful way to recover confiscated property" and thus violated due process.) Plaintiffs have thus demonstrated "a clear or substantial likelihood" of success on the merits of their procedural

---

[5] Furthermore, even the process outlined by the City's policy would be an erroneous deprivation because the policy does not offer a realistic process for homeless people to retrieve property. (*See supra* Subsection III(b); Sweeps Policy at 3–7, sec. D.)

due process claim.

### 2.    Unreasonable Seizure

Under the Fourth Amendment, a "seizure" occurs "where there is some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County, Ill.*, 506 U.S. 56, 63 (1992).  The government may not "unreasonably" seize a person's property.  *Basel Soukaneh v. Andrzejewski*, 112 F.4th 107, 116 (2d Cir. 2024).  Courts determine whether a seizure is "unreasonable" by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  *Id.*  As "the property of the homeless is entitled to Fourth Amendment protection," the confiscation and destruction of an individual's personal property must meet a high threshold to be warranted.  *Lavan v. City of L.A.*, 797 F. Supp. 2d 1005, 1015–17 (C.D. Cal. 2011).

Here, the government is seizing homeless residents' property and destroying it in garbage trucks.  *(See supra* Subsection I.)  Moreover, the City regularly seizes belongings homeless residents need to survive, such as warm clothing, sleeping bags, medications, walkers, personal identification documents, and personal effects of sentimental value, such as family photographs and memorabilia.  (*See supra* Subsection I(B)(2)); *see also Pottinger v. Miami,* 810 F. Supp. 1551, 1559, 1570–73 (S.D. Fla. 1992) ("For many of us, the loss of our personal effects may pose a minor inconvenience.  However . . . the loss can be devastating for the homeless.")).

Accordingly, sweeps necessarily intrude on Fourth Amendment interests because they involve: (a) the permanent deprivation of personal property; and (b) the seizure of belongings homeless people need to function.  The seizure of homeless residents' property is thus inherently unreasonable.  *E.g.*, *Kincaid*, 2006 WL 3542732 *36 ("The interference with Plaintiffs' possessory interests is more than just 'meaningful;' it is total and irrevocable, since the City seizes and then

immediately destroys all of the property that it seizes in its sweeps . . . such seizures . . . are 'more intrusive than necessary' and thus unlawful."); *Lavan,* 693 F.3d at 1030; *Garcia v. City of L.A.,* 11 F.4th 1113, 1124 (9th Cir. 2021); *Mitchell,*  2016 WL 11519288 *3–4.  The fact that, at times, the City has seized homeless residents' property while it was momentarily unattended does not weaken that conclusion.  *See Pottinger v. City of Miami,* 810 F. Supp. 1551, 1559 (S.D. Fla. 1992) ("[homeless] property . . . is reasonably distinguishable from truly abandoned property" because it can be "reasonably identifiable by its nature and organization.").  Plaintiffs and many homeless New Yorkers have had their property seized and destroyed after temporarily leaving that property arranged in a way clearly suggesting ownership i.e., organized neatly against a building while running a brief errand, using restroom facilities, or attending an appointment, with the intention of returning.  (*E.g.*, Hine ¶ 14; Gonzalez ¶¶ 26–27; Grey ¶¶ 14–15; Laverpool ¶ 16; Mendez Montejo ¶ 11; Penzlien ¶ 18; Rastogi ¶¶ 24–25; Strom ¶ 31; Ventura ¶¶ 28–29; Voorhees ¶ 34.)

Homeless residents' interest in their property clearly outweighs any interest Defendants have in seizing it.  Defendants may assert the property seized was obstructing public rights of way, constituted a structure, and or posed a health and sanitation concern.  Plaintiffs, however, have demonstrated by clear and convincing evidence the City often seizes property deliberately positioned to not obstruct the public in any way.  (*E.g.*, Bethel ¶ 7; Chapman ¶ 6; Cruz Aragón ¶ 4; Hine ¶ 18; Laverpool ¶ 15; Mendez Montejo ¶ 5; Strom ¶ 33; Ventura ¶ 7.)  The City also regularly sweeps sites where there are no structures present.  (Hine ¶ 17; Ventura ¶ 8; Strom ¶ 33.)  Its own data demonstrates most sites swept are classified as "pop-ups," which by definition do not feature structures.  (Sweeps Policy at 2; Compl. ¶ 124.)  Moreover, violation of a city ordinance or state law does not eliminate a person's property interest.  *Lavan,* 693 F.3d at 1032.  Finally, the City regularly seizes property that does not pose a health or sanitation concern, such as family

photographs, artwork, medication, and clothing.  (*E.g.,* Cruz Aragón ¶¶ 12, 14; Hayes ¶ 12–18; Laverpool ¶ 9; Mendez Montejo ¶¶ 12–13; Strom ¶¶ 33; Ventura ¶¶ 19–20.)  The City does not make meaningful attempts to distinguish between residents' property and actual trash.  (*E.g.,* Hartman ¶ 13; Cruz Aragón ¶ 12; Laverpool ¶ 12; Mendez Montejo ¶¶ 10, 14.)  Accordingly, the wholesale and indiscriminate destruction of homeless residents' belongings cannot be justified on public health and safety grounds.  *See Mitchell*, 2016 WL 11519288 *3–4; *Fund for Empowerment*, 646 F. Supp. 3d at 1129.

Plaintiffs have therefore demonstrated "a clear or substantial likelihood" of success on the merits of their unreasonable seizure claim.

### 3.    State-Created Danger

A governmental actor is liable under the Due Process Clause of the Fourteenth Amendment for affirmatively creating or increasing the danger of violence on a private individual.  *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993).  Specifically, for engaging in "deliberate indifference" exposing plaintiffs to known and obvious dangers they would not otherwise face.  *Pena v. DePrisco*, 432 F.3d 98 (2d. Cir. 2005).  The conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Velez v. Levy,* 401 F.3d 75, 93-94 (2d. Cir. 2005)).

Here, the City's continued policy and custom of depriving homeless residents of their life-sustaining property and displacing them during sweeps exposes them to known and obvious dangers they would not otherwise face, such as death and injury.  For example, the City's affirmative and routine confiscation and destruction of tarps, blankets, and warm clothing knowingly exposes and leaves homeless residents defenseless against rain, snow, and other harsh elements.  (*See supra* Subsection II.)  The City also knowingly destroys other vital, life-sustaining

belongings, including medication, wheelchairs, walkers, medical devices, and EBT cards, knowing the barriers homeless people face in replacing them.  (*Id*.)  By permanently depriving people of such belongings, the City is directly worsening the health outcomes of these individuals.  (Shi ¶ 9.)  For example, individuals with chronic conditions requiring medication, such as HIV and heart failure, can face an increased risk of hospitalization and death, while individuals who rely on canes or wheelchairs may face "limit[ed] mobility and worsening chronic musculoskeletal conditions." (Shi ¶ 6; Isaacsohn ¶ 10; Laverpool ¶ 10.)  The destruction of important documentation makes it more difficult for these individuals to access medical and other vital services.  (Hayes ¶¶ 19–20.)

The City further exposes homeless residents to known and obvious dangers by conducting sweeps during harsh weather, such as freezing temperatures and rain, with the knowledge they will likely remain outside.  (*See supra* Subsection II.)  This displacement further endangers these individuals, by forcing them to relocate to sites with less protection from the elements and increasing their exposure to deadly weather conditions, or forcing them to relocate to more hidden environments where they are at a greater risk of violence and are cut off from their community and health support systems.  (Bethel ¶ 18; Hine ¶ 8, 24; Isaacsohn ¶¶ 12, 16; Rastogi ¶ 30; Shi ¶ 8.)  Even as the City creates these dangers, it has taken no affirmative or obvious steps to address or mitigate the risk of harm.  Such conduct demonstrates the City's consistent disregard for the individuals' health and safety and shocks the contemporary conscience.

Accordingly, Plaintiffs have demonstrated "a clear or substantial likelihood" of success on the merits of their state-created danger claim.  *See Sacramento Homeless Union v. County of Sacramento*, 617 F. Supp. 3d 1179, 1190–93 (E.D. Cal. 2022).

## III.    BALANCE OF EQUITIES AND THE PUBLIC INTEREST

### A.    Legal Standard

As an alternative to demonstrating a likelihood of success on the merits, a movant may

demonstrate "serious questions on the merits and a balance of hardships decidedly favoring the moving party." *Havens*, 76 F.4th at 130; *Banco*, 700 F. Supp. 3d at 96. "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).[6] The considerations for the "balance of hardships" are the same as those for the final requirement for obtaining an injunction—namely, "whether granting the preliminary injunction would be in the public interest." *Bionpharma*, 582 F. Supp. 3d at 178. For both, a court must "balance the competing claims of injury and must consider the effect on each party of the granting

---

[6] "[W]here the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard … ." *Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009); *Banco*, 700 F. Supp. 3d at 96. That does not apply here for several reasons. First, the action of unreasonably seizing and destroying homeless people's property without process is not taken pursuant to a statutory or regulatory scheme, but in contravention of a written agency-level policy, as outlined in Plaintiffs' complaint. Although the written policy at issue does contemplate property disposal and violates due process on its face, sweeps are often conducted in a manner that deviates from the written policy in a way that even more egregiously violates the law. Second, the sweeps are not serving the public interest, but deepening the problems they purport to address, as explained in Plaintiffs' complaint. Regardless, as discussed above, Plaintiffs also meet the more rigorous "likelihood of success" standard.

or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction."  *Yang v. Kosinski*, 960 F.3d 119, 135–36 (2d Cir. 2020); *Bionpharma*, 582 F. Supp. 3d at 178.

**B.    Application**

Here, the balance of equities and public interest strongly favor granting an injunction.  As to the parties' competing claims of injuries, the injuries to Plaintiffs and the putative class members are widespread and devastating—(*see supra* Subsection I(B)(2))—and are clearly more significant than whatever injury, if any, Defendants may incur by simply ceasing their unconstitutional conduct.  Any impact on Defendants is significantly outweighed by Plaintiffs' repeated experiences of being forcibly displaced from their sites and having their survival gear and sentimental belongings confiscated.  Sweeps place homeless New Yorkers in an increasingly precarious position.  Defendants, on the other hand, have an array of policy alternatives at their disposal that do not involve harming and risking the lives of an already vulnerable population.

Accordingly, the balance of hardships and public interest support granting an injunction.

## <u>CONCLUSION</u>

For the reasons explained above, Plaintiffs respectfully request the Court issue a temporary restraining order and then order Defendants to show cause why a preliminary injunction should not be put in place during the pendency of this litigation.

Dated: December 9, 2024
    New York, New York

URBAN JUSTICE CENTER – SAFETY NET PROJECT

Natalie Druce
Marika Dias
40 Rector St, 9th Floor
New York, NY 10006
P: (646) 923.8316

E: ndruce@urbanjustice.org


NATIONAL HOMELESSNESS LAW CENTER

_____
Siya U. Hegde
1400 16th Street NW, Suite 425
Washington, DC 20036
P: (202) 638-2535, Ext. 105
E: shegde@homelesslaw.org


BELDOCK LEVINE & HOFFMAN, LLP

_____
Keegan Stephan
Luna Droubi
99 Park Avenue, PH/26th Floor
New York, New York 10016
P: (212) 277-5820
F: (212) 277-5880
E: kstephan@blhny.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF WORD COUNT

Pursuant to Section II(D) of the Individual Practices of Judge John G. Koeltl, I certify

that this brief contains 7,000 words and complies with the Judge's formatting rules.

Dated: December 23, 2024
      New York, New York

_____
Keegan Stephan
Beldock Levine & Hoffman, LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
P: (212) 277-5820
F: (212) 277-5880
E: kstephan@blhny.com

*Attorneys for Plaintiff*