UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

URBAN JUSTICE CENTER – SAFETY NET
PROJECT and GERALD BETHEL, TRESE
CHAPMAN, ANTONIA HAYES, EDUARDO
VENTURA, DAMIAN VOORHEES, and ABED
CAMPOS individually and on behalf of all other
similarly situated persons,

                                       Plaintiffs,

                 - against -

THE CITY OF NEW YORK, ERIC ADAMS,
MOLLY WASOW PARK, JOSLYN CARTER,
JAVIER LOJAN, JESSICA TISCH, THOMAS G.
DONLON, SUE DONOGHUE, YDANIS
RODRIGUEZ, MARIE THERESE DOMINGUEZ,
ANDREW KIMBALL, NEW YORK CITY
ECONOMIC DEVELOPMENT CORPORATION,
and JOHN AND JANE DOES 1–20,

                                 Defendants.

**FIRST AMENDED CLASS ACTION
COMPLAINT AND DEMAND FOR
JURY TRIAL**

24-CV-8221 (JGK)

---

       Plaintiffs, by and through their attorneys at the Urban Justice Center – Safety Net Project,

National Homelessness Law Center, and Beldock Levine & Hoffman LLP, allege as follows:

## PRELIMINARY STATEMENT

       1.     Plaintiffs bring this putative class action to challenge the policy and custom of

"homeless sweeps," also referred to herein as "sweeps" and "cleanups", where Defendant City of

New York ("the City"), its agents and agencies, and its "cleaning partner agencies"—including the

New York State Department of Transportation ("SDOT") and New York City Economic

Development Corporation ("NYCEDC")—seize and destroy the personal belongings of homeless

New Yorkers residing outdoors ("homeless residents") without due process and force them to

move along from relatively established locations, depriving some of the City's most vulnerable

residents of their basic necessities and leaving them endangered and in peril.[1]

2.      The City currently carries out thousands of homeless sweeps per year.   From October 2021 through June 2024, the City conducted over 11,500 sweeps.[2]  During these sweeps, the City seizes and destroys items that are critical to homeless residents' survival, including warm clothing, medications, bedding, and personal documentation (*i.e.*, identification cards and birth certificates) needed to access public services, secure permanent housing, seek employment, and apply for public benefits.

3.      The City consistently fails to give adequate, timely notice to homeless residents in advance of sweeps and, in many instances, does not give any notice at all.  In cases where the City does provide advance notice of a sweep, the notice does not state the basis for the sweep, offer any avenue for homeless residents to contest the sweep, or sufficiently alert homeless residents to the risk that they may have their personal property seized and destroyed during a sweep.

4.      The City does not offer any kind of post-deprivation mechanism for lawful owners to reclaim personal property that was taken.  Instead, sweeps teams, which at times include SDOT and NYCEDC, throw homeless residents' belongings in a sanitation truck and summarily destroy them with the trucks' compactors.

5.      The City also forcibly displaces homeless residents during sweeps, making them relocate from sites where they have sought shelter and security.

6.      The City carries out sweeps pursuant to a written policy, which is facially

---

[1] The City refers to "homeless sweeps" as "cleanups."  Where this complaint refers to "the City" conducting homeless sweeps or cleanups, that term includes the relevant City agencies and non-City "partner agencies," including the SDOT and NYCEDC whose role in said sweeps or cleanups relates to the removal and destruction of homeless residents' belongings.

[2] Plaintiff UJC-SNP obtains date and location data regarding homeless sweeps by routinely submitting Freedom of Information Law ("FOIL") requests to the New York City Department of Social Services and New York City Department of Sanitation.

inadequate and unconstitutional, and it deviates from that policy in practice in ways that are unlawful and unconstitutional.

7.      The City purports to conduct sweeps to connect homeless New Yorkers with social services, dismantle physical structures it deems illegal or unsafe, address sanitation conditions, and provide temporary storage for residents' personal belongings. The reality, however, is that displacing homeless people and seizing and destroying their personal belongings does nothing to advance these goals.

8.      Organizational Plaintiff Urban Justice Center – Safety Net Project ("UJC-SNP") is a direct services provider that renders assistance to homeless New Yorkers who experience homeless sweeps and has diverted significant organizational resources to doing so.

9.      The Individual Plaintiffs are homeless New Yorkers who have been subjected to numerous homeless sweeps and are at imminent risk of being subjected to additional homeless sweeps in the immediate future.[3]   The City's homeless sweeps have violated the rights of Plaintiffs—and all similarly situated persons—under the Fourth and Fourteenth Amendments to the United States Constitution, as well as Article XVII of the New York State Constitution, and the laws of the City and State of New York.

10.      Defendants have been deliberately indifferent to the violations of Plaintiffs' rights and knowingly facilitated the displacement of homeless New Yorkers and destruction of their property.

11.      Accordingly, Plaintiffs now bring this putative class action on behalf of themselves and all similarly situated New Yorkers in order to end the unlawful and inhumane policy and custom of homeless sweeps.

_____

[3] Since the filing of the initial complaint, Plaintiff Eduardo Ventura has obtained housing.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), and over their state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of Plaintiffs' claims arose in the Southern District of New York.

## PARTIES

14.     Plaintiff UJC-SNP is one of eight independent projects of the Urban Justice Center, a nonprofit 501(c)(3) organization incorporated in the State of New York. UJC-SNP conducts its operations in the City, County, and State of New York.

15.     Plaintiff Gerald Bethel was at all relevant times an unhoused resident of New York City.

16.     Plaintiff Trese Chapman was at all relevant times an unhoused resident of New York City.

17.     Plaintiff Antonia Hayes was at all relevant times an unhoused resident of New York City.

18.     Plaintiff Eduardo Ventura was at all relevant times an unhoused resident of New York City.

19.     Plaintiff Damian Voorhees was at all relevant times an unhoused resident of New York City.

20.     Plaintiff Abed Campos was at all relevant times an unhoused resident of New York City.

21.     Defendant City of New York is a municipal entity created and authorized under the laws of the State of New York and the New York City Charter.  The City is authorized by law to maintain a number of agencies to carry out municipal functions and—of relevance here—

maintains the New York Police Department ("NYPD"), Department of Social Services ("DSS") (which includes the Department of Homeless Services ("DHS") and Human Resources Administration ("HRA")), Department of Sanitation ("DSNY"), Department of Parks & Recreation ("Parks Department"), and Department of Transportation ("CDOT"). Defendant City assumes the risks incidental to the maintenance of those departments and their employees because those risks attach to the public consumers of the services provided by those agencies.

22.     In this Complaint, the City, agencies, and individuals being sued in their official capacities are collectively referred to as "the Municipal Defendants."

23.     Defendant Eric Adams is and was at all relevant times the Mayor of the City of New York. As such, he is the Chief Executive Officer of the City, and has final authority to promulgate and enforce the City's strategies and policies, oversee city agency operationalization, and execute other central management functions, including the implementation of city council decisions. He is sued in his individual and official capacities.

24.     Defendant Joslyn Carter is and was at relevant times the Administrator of DHS. As such, she has final authority to promulgate and implement administrative managerial policies and procedures, including policies and procedures issued by DSS. Specifically, Defendant Carter is charged with the management and oversight of the City's borough-based shelter system designed to assist unhoused New Yorkers. She is sued in her individual and official capacities.

25.     Defendant Molly Wasow Park is and was at relevant times the Commissioner of DSS. As such, she has final authority to promulgate and implement administrative managerial policies and procedures issued by HRA and DHS, which are both units within DSS, and the operationalization of social services and public welfare programs across the City. She is sued in her individual and official capacities.

26.     Defendant Javier Lojan is Acting Commissioner of DSNY.  As such, he has final authority to promulgate and implement administrative managerial policies and procedures relating to the City's garbage collection, recycling collection, waste disposal, street cleaning, removal of snow and ice, and other sanitation-related operations, and oversees the operationalization of the City's waste management system.  She is sued in her individual and official capacities.  Prior to Defendant Logan, Defendant Tisch was the Commissioner of DSNY.

27.     Defendant Jessica Tish is the Commissioner of the NYPD.  As such, he has final authority to promulgate and implement administrative managerial policies and procedures relating to NYPD recruitment and in-service training, personnel management, and discipline with regard to NYPD officers' performance of their duties.  He is sued in his individual and official capacities. Prior to Defendant Tish, Defendant Thomas G. Donlon was at all other relevant times the Commissioner of the NYPD.

28.     Defendant Sue Donoghue is and was at relevant times the Commissioner of the Parks Department.  As such, she has final authority to promulgate and implement administrative managerial policies and procedures relating to the expansion of environmental stewardship across the City's public parks.  The scope of her responsibilities requires her focus on making public greenspaces safe and accessible to all New Yorkers, including those individuals living in underserved neighborhoods and who risk exposure to the elements.  She is sued in her individual and official capacities.

29.     Defendant Ydanis Rodriguez is and was at relevant times the Commissioner of CDOT.  As such, he has final authority to promulgate and implement administrative managerial policies and procedures relating to the City's transportation infrastructure.  This includes, but is not limited to, his oversight and management of mass transit redesign, sustainable and affordable

transportation (*i.e.*, bus and bicycle utility), and the safe accessibility of pedestrian walkways for all New Yorkers.  He is sued in his individual and official capacities.

30.    Defendant Marie Therese Dominguez is and was at all relevant times the Commissioner of the SDOT.  As such, she has final authority to promulgate and implement administrative managerial policies and procedures relating to the State's transportation infrastructure.  This includes, but is not limited to, the development and operationalization of transit facilities, services for highways, railroads, mass transit systems, waterways, and aviation facilities, and the administration of a public safety program for those transportation carriers engaged in interstate commerce.  She is sued in her individual and official capacities.

31.    Defendant NYCEDC is and was at all relevant times a public-benefit nonprofit corporation incorporated in Warren County, New York.  Defendant Andrew Kimball is NYCEDC's President and CEO and has the final authority to promulgate and implement organizational policies and procedures relating to its consumer and infrastructural portfolio.  This includes, but is not limited to, the creation of economic development services, administration of government financing programs to expand the City's businesses, the administration of the New York City Industrial Development Agency and New York City Capital Resource Corporation, and the rehabilitation of working waterfronts across the City. NYCEDC is sued in its individual and official capacities as an independent entity. Andrew Kimball is sued in his individual and official capacity.

32.    Defendants John Does and Jane Does 1–20 NYPD, DSNY, CDOT, SDOT, NYCEDC, Parks Department, and DHS officers are, and were at all relevant times, officers, employees, and agents of the NYPD, DSNY, CDOT, SDOT, NYCEDC, Parks Department, and DHS. In this Complaint, the John and Jane Doe Defendants are referred to as the "Individual

Defendants."

33.     The true and complete names, rank, and shield numbers of the John and Jane Doe Defendants are not currently known.  However, they were employees or agents of the NYPD, DSNY, CDOT, SDOT, NYCEDC, Parks Department, and DHS during the incidents described below.  Accordingly, they may be entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law § 50-k, or, in the case of SDOT, the New York State Attorney General's office ("the Attorney General's office").  The Law Department and the Attorney General's office are thus put on notice that (a) Plaintiffs intend to name those individuals as Defendants in an amended pleading once their true and complete names, ranks, and shield numbers become known, and (b) the Law Department and the Attorney General's office should immediately begin preparing their defenses in this action.

34.     At all relevant times, the John and Jane Doe Defendants, as well as the named defendants, acted under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of the City or New York State, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.  They were acting for and on behalf of the City or New York State, with the power and authority vested in them as officers, agents, and employees of the City or New York State and incidental to the lawful pursuit of their duties as officers, employees, and agents of the City or New York State.

## STATEMENT OF FACTS

### I.    Homeless Sweeps in New York City

#### A.    New York City is Experiencing Record Levels of Homelessness and Systemically-Created Street Homelessness

35.    New York City is experiencing a massive affordable housing crisis that shows no signs of abating[4] and the homeless population in New York City is currently at its highest level since the Great Depression.[5]  Between 2022 and 2023, the homeless population in New York City increased by 42%, making it the major city with the greatest increase in people experiencing homelessness in the country.[6]

36.    In August 2024, there were approximately 147,106 reported homeless people residing in New York City's shelter system, including almost 32,000 individuals staying at migrant shelters.[7]  The City estimated that there were 4,140 people living unsheltered in New York City[8]

---

[4] New York City is experiencing the lowest vacancy rate in more than 50 years and evictions nearly tripled in 2023 from the year prior.  *See* Mihir Zaveri, *New York City's Housing Crunch Is the Worst It Has Been in Over 50 Years*, N.Y. Times (Feb. 8, 2024), https://www.nytimes.com/2024/02/08/nyregion/apartment-vacancy-rate-housing-crisis.html;  *see also,* David Brand, *NYC Evictions Surged in 2023, with Legal Lockouts Nearing Pre-COVID Levels*, Gothamist (Jan. 11, 2024), https://gothamist.com/news/nyc-evictions-surged-in-2023-with-legal-lockouts-nearing-pre-covid-levels.

[5] Coalition for the Homeless, *Basic Facts About Homelessness: New York City* (Jun. 2024), https://www.coalitionforthehomeless.org/basic-facts-about-homelessness-new-york-city.

[6] U.S. Dep't of Hous. & Urban Dev., 2023 Annual Homelessness Assessment Report to Congress ("AHAR"), Part 1: Point-In-Time Estimates of Homelessness (Dec. 2023) 20–21, https://www.huduser.gov/portal/sites/default/files/pdf/2023-ahar-part-1.Pdf    [https://perma.cc/25X9-3U4V].

[7] Patrick Spauster et al., *NYC Shelter Count*, City Limits, https://citylimits.org/nyc-shelter-count (last visited Oct. 29, 2024); *see also,* Patrick Spauster et al., *Tracking NYC's Record-High Homeless Shelter Population*, City Limits (Dec. 7, 2023), https://citylimits.org/2023/12/07/tracking-nycs-record-high-homeless-shelter-population.

[8] The United States Department of Housing and Urban Development ("HUD") estimated

as of January 2024 pursuant to the Homeless Outreach Population Estimate ("HOPE").[9] That, however, is widely considered to be a significant undercount due to the methodological flaws inherent in a one-night point-in-time count.[10]

37.     New York City offers shelter through a network of municipal shelter systems pursuant to the *Callahan* consent decree and subsequent judgments, which recognized the right to shelter guaranteed under the New York State Constitution.[11] Nevertheless, distinct populations of homeless people are denied equal access to shelter. This includes homeless migrants who arrived in the United States after March 15, 2022[12] and populations such as LGBTQ+ adults,[13] domestic

---

that there were 5,007 individuals living unsheltered in New York State during its January 2023 point-in-time count.  U.S. Dep't of Hous. & Urban Dev., *supra* n.5, at 17.

[9] N.Y.C. Dep't of Soc. Serv., *Homeless Outreach Population Estimate: 2024 Results,* https://www.nyc.gov/assets/dhs/downloads/pdf/hope/hope-2024-results.pdf.

[10] *See Martin v. Boise*, 920 F.3d 584, 604 (9th Cir. 2019), petition for cert. docketed, No. 19-247 (U.S. Aug. 26, 2019) ("It is 'widely recognized that a one-night point in time count will undercount the homeless population,' as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers and the number of homeless people staying at shelters or accessing services on the night of the count.").  *See also* Nat'l Law Ctr on Homelessness & Poverty, *Don't Count On It: How the HUD Point-in-Time Count Underestimates the Homelessness Crisis in America* (2017), https:// homelesslaw.org/wp-content/uploads/2018/10/HUD-PIT-report2017.pdf [https://perma.cc/6CBS-FR3U].

[11] Coalition For the Homeless, *The Callahan Legacy: Callahan v. Carey and the Legal Right to Shelter*, https://www.coalitionforthehomeless.org/our-programs/advocacy/legal-victories/the-callahan-legacy-callahan-v-carey-and-the-legal-right-to-shelter [https://perma.cc/ PXA8-W6DA].

[12] Luis Ferré-Sadurní & Olivia Bensimon, *A Growing Number of Homeless Migrants Are Sleeping on N.Y.C. Streets,* N.Y. Times (Aug. 9, 2024), https://www.nytimes.com/2024/08/09/ nyregion/migrants-homeless-encampment-nyc.html.

[13] There is only one dedicated shelter for LGBTQ+ adults over the age of 24, Marsha's House, which is located in the Bronx, has a maximum capacity of 81 beds and serves LGBTQ+ young adults up to the age of 30.  *See* Sunny Nagpaul, *NYC's Only Designated Shelter for Queer Adults is a 'Nightmare' of Misconduct and Living Conditions*, Fortune (Jul. 28, 2024), https://

violence survivors,[14] and runaway and homeless youth between the ages of 16 and 24 due to bed shortages in shelters designed for vulnerable populations.[15]  In addition, many homeless New Yorkers cannot access shelter for reasons such as an unwillingness on the part of shelters to reasonably accommodate their disabilities, their past traumatic incidents in the shelter system, and substandard shelter conditions that endanger their health and safety.

38.    Due to systemic barriers to accessing shelter, thousands of unhoused New Yorkers have little choice but to reside in the street with their belongings.

**B.    New York City has a Long History of Policing and Criminalizing Street Homeless Individuals**

39.    "Homeless sweeps" refer to the City's policy and custom of seizing and destroying the personal belongings of homeless persons residing on the streets in New York City and forcing these persons to temporarily or permanently relocate.  The City refers to this practice as "cleanups."

40.    The interagency machinery that underpins New York City's current municipal policy on sweeps has existed since 2015.  The first official sweeps policy document laying out a version of this municipal policy in written form was issued by DHS in 2017 and subsequently revised in 2020 and 2022.  The most recent iteration of the written policy was issued in June 2024.

---

fortune.com/2024/07/28/marshas-house-shelter-bronx-new-york-lgbtq-jhaasryel-akquil-bishop.

[14] *See* Karen Yi, *Domestic Violence Survivors Bounce Between NYC Shelters as Housing Options Dwindle*, Gothamist (Jul. 18, 2024), https://gothamist.com/news/domestic-violence-survivors-bounce-between-nyc-shelters-as-housing-options-dwindle.  There is a statutory 180-day cap on stays in domestic violence shelters under State law.

[15] *See* Katie Honan, *Number of City Youth With Nowhere to Sleep at Night Climbs*, The City (Sep. 16, 2024), https://www.thecity.nyc/2024/09/16/nyc-youth-nowhere-to-sleep-climbs; David Brand & Daniel Parra, *NYC's Youth Shelter System Is Running Out of Space*, City Limits (Sep. 29, 2022), https://citylimits.org/2022/09/29/nycs-youth-shelter-system-isrunning-out-of-space.

41.     New York City, however, has a long history of enacting punitive policies and practices that seek to remove homeless individuals from public space, criminalize and police them, and violate their civil and constitutional rights.  Throughout the 1970s and early 1980s, police officers conducted "cleanup drives," primarily targeting street homeless people residing along the Bowery on the Lower East Side of Manhattan, which continued under several administrations.[16] In 1982, the NYPD established a unit within itself known as the Homeless Outreach Unit, originally designed to forcibly move homeless people out of city transit facilities and into shelters or social service programs.[17]  In the late 1990s, the NYPD implemented a practice of arresting street homeless individuals who refused to comply with move along orders or to accept transportation to a congregate shelter.  Between November 23 and December 10, 1999, 226 homeless people were arrested in New York City.[18] Throughout the Bloomberg administration, in the early 2000s, the City instituted a practice of giving homeless people one-way tickets out of New York City, a measure that Mayor Bloomberg believed would reduce the city's "chronic homeless" population by simply diverting them elsewhere.[19]

42.     In 2015, under the De Blasio administration, the City created an interagency

---

[16] Thomas J. Main, Homelessness in New York City: Policymaking from Koch to DeBlasio (NYU Press, 2016) 13.

[17] Siya Hegde and Carlton Martin, With Liberty and Justice for ALL: The Case for Decriminalizing Homelessness and Mental Health in America, 21 Indiana Health L. Rev. 266 (2024).

[18] Lynne Duke, *The Unsheltered in a Storm*, N.Y. Times (Dec. 10, 1999), https://www.washingtonpost.com/archive/politics/1999/12/11/the-unsheltered-in-a-storm/f55739d4-7a17-4f8b-9b13-a71a3c82e888.

[19] Matthew Weaver, *New York Gives Homeless People a One-way Ticket to Leave City*, Guardian (Jul. 29, 2009), https://www.theguardian.com/world/2009/jul/29/new-york-homeless-ticket-leave.

apparatus to conduct sweeps. This was comprised of teams of workers from different municipal agencies, including DHS, DSNY, and the NYPD, and New York State's SDOT, to conduct sweeps of homeless sites.[20]

43.    From 2016 to 2020, the City steadily and significantly increased the number of homeless sweeps that it conducted each year, according to data produced by DSS: roughly 155 sweeps in 2016, 426 above-ground sweeps in 2017, 507 sweeps in 2018, 668 sweeps in 2019, and 1293 above-ground sweeps in 2020.[21]

44.    The City continued to sweep homeless New Yorkers at alarming rates throughout the height of the COVID-19 pandemic, when overcrowded congregate shelters presented serious health and safety risks to residents, employees, and the broader community.[22] These sweeps were carried out in blatant violation of Center for Disease Control Guidance, which advised cities against sweeping homeless encampments during this period due to the dangers it created, including the increased spread of COVID-19.[23]

45.    In the Summer of 2020, in recognition of the counter-productive impact that police

---

[20] Nikita Stewart & J. David Goodman, *Despite Vow, Mayor de Blasio Struggles to Curb Homelessness*, N.Y. TIMES (Oct. 26, 2015), https://www.nytimes.com/2015/10/27/nyregion/despite-vow-mayor-de-blasio-struggles-to-stop-surge-in-homelessness.html.

[21] See supra n.2.

[22] As of June 1, 2020, the age-adjusted mortality rate for homeless New Yorkers in shelters was 61% higher than the New York City rate. In April 2020 alone, 58 homeless New Yorkers died of COVID-19, 54 of whom resided in the shelter system. Coalition for the Homeless, *COVID-19 and Homelessness in New York City: Pandemic Pandemonium for New Yorkers Without Homes* (Jun. 2020), https://www.coalitionforthehomeless.org/wp-content/uploads/2020/06/COVID19 HomelessnessReportJune2020.pdf.

[23] Andy Newman, *N.Y.C. Doubled 'Cleanups' of Homeless Encampments Last Year, Despite C.D.C. Guidance to Let Them Be*, N.Y. Times (Mar. 3, 2021), https://www.nytimes.com/2021/03/03/world/new-york-city-homeless-cleanups-covid-coronavirus.html.

officers have on homeless residents during sweeps, the City stated that they would be removing NYPD officers from homeless outreach and sweeps teams and eventually disbanded the NYPD Homeless Outreach Unit.[24] However, upon information and belief, in practice, the NYPD continued to be present at many sweeps of homeless New Yorkers. The NYPD's role in sweeps operations was further expanded in early 2022 under the Adams administration, with the NYPD deciding which encampments would get swept and officers attending all scheduled sweeps.[25]

46.    In 2021, the De Blasio administration dramatically expanded the number of sweeps occurring per year, with 6,604 sweeps scheduled in that year.

47.    This escalation continued with the administration of Mayor Eric Adams. In March 2022, Mayor Adams convened a task force consisting of DHS, the NYPD, DSNY, and the Parks Department to dismantle homeless encampments across the City.[26] The City reportedly swept 239 sites in 12 days, affecting hundreds of homeless individuals, with only five individuals swept by the City ultimately obtaining shelter placements.[27]

48.    SDOT partners with the City and its respective task force in implementing the

---

[24] Mirela Iverac, *NYPD Scales Back "Outreach" To Homeless in Subway System*, Gothamist (Jul. 17, 2020), https://gothamist.com/news/nypd-scales-back-outreach-homeless-subway-system; *NYPD Eliminates Homeless Outreach and Shelter Security Unit*, CBS (July 16, 2020), https://www.cbsnews.com/newyork/news/nypd-homeless-outreach-eliminated.

[25] David Brand, *The NYPD Now Decides What Homeless Encampments Get Swept*, City Limits (Sep. 21, 2022), https://citylimits.org/2022/09/21/the-nypd-now-decides-what-homeless-encampments-get-swept.

[26] NYC Office of the Mayor, *Transcript: Mayor Eric Adams Makes a Social Services Related Announcement* (Mar. 30, 2022), https://www.nyc.gov/office-of-the-mayor/news/169-22/transcript-mayor-eric-adams-makes-social-services-related-announcement.

[27] Andy Newman & Michael Gold, *New York City Clears 239 Homeless Camps. Only 5 People Move to Shelters*, N.Y. Times (Mar. 30, 2022), https://www.nytimes.com/2022/03/30/nyregion/nyc-homeless-eric-adams.html.

sweeps policy and conducting sweeps, as SDOT is the entity responsible for the health and safety of public freeways, underpasses, parks, and other spaces within its jurisdiction on which encampments may be situated.

49.    The City and its partner agencies, including SDOT and NYCEDC, ramped up sweeps of homeless New Yorkers during the summer and fall of 2023, conducting sweeps at a rate of roughly 500 sweeps per month.[28]

**C.    Sweeps Cause Irreparable Harm to Homeless New Yorkers**

50.    The City of New York carries out thousands of homeless sweeps each year.  During the first six months of 2024 alone, the City scheduled and conducted over 2,000 sweeps where DSNY was the designated "cleaning partner."[29]  Data produced by DSNY and DSS shows that the City performs sweeps at a wide range of locations across each of the five boroughs, concentrating most heavily on Manhattan, Brooklyn, and Queens. Between June of 2016 through February 2025, 632 sweeps involving SDOT were conducted at locations across Manhattan, Brooklyn, the Bronx, and Queens, including, but not limited to, the Long Island Expressway, Cross Bronx Expressway, Manhattan Bridge, Van Wyck Expressway, falling under the territorial jurisdiction of the SDOT.[30]

51.    The City carries out sweeps consistently throughout the year, including in below-

---

[28] Karen Yi, *Mayor Adams' Homeless Encampment Sweeps Reached New High Last Fall*, Gothamist (Apr. 8, 2024), https://gothamist.com/news/mayor-adams-homeless-encampment-sweeps-reached-new-high-last-fall. *See also* David Brand, *Adams Made Homeless Sweeps a Priority. Tracking Outcomes? Not So Much.*, Gothamist (Sept. 23, 2024), https://gothamist.com/news/adams-made-homeless-sweeps-a-priority-tracking-their-outcomes-not-so-much.

[29] *See supra* n.2.  These datasets, produced by DSNY, do not capture sweeps in which a partner agency other than DSNY were involved as the designated "cleaning partner," *i.e.*, Parks Department, CDOT, SDOT, or NYCEDC.

[30] This data was extracted from a response to a Freedom of Information Law request, designating SDOT's actual sweeps involvement.

freezing temperatures during the winter months and during heatwaves in the summer months.  It forces people to relocate before depriving them of life-preserving warm clothing, blankets, waterproof coverings, and medications, often with very limited to no warning—a deprivation that would be widely acknowledged as unlawful if carried out against housed residents in analogous contexts.  By way of contrast, the City neither approaches nor seizes the personal property of housed New Yorkers who they find picnicking or napping in the park, or resting on benches.

52.     During sweeps, the City has summarily seized and destroyed vital personal documentation that homeless New Yorkers need to access public benefits, enter low-barrier shelter, apply for permanent or transitional housing, and obtain employment.  Along with life-sustaining property, the City has destroyed personal items of sentimental value, including family heirlooms and photographs of deceased loved ones that are irreplaceable.

53.     The seizure and destruction of homeless residents' personal belongings during sweeps has been well documented in the media.[31]  Homeless residents have reported having their encampments trashed, their valuable possessions thrown into the back of sanitation trucks and compacted on the spot, and being aggressively forced to move along by NYPD officers.[32]

54.     The City repeatedly returns to the same sites to carry out sweeps, sometimes within days of a prior sweep.[33]  The outcome of this is that homeless residents are forced to leave their

---

[31] Robin Kaiser-Schatzlein, *The Cruel Theater of Encampment Sweeps*, Curbed (Apr. 1, 2022), https://www.curbed.com/2022/04/adams-homeless-sweeps-encampments.html;  Andy Newman et al., *Adams Says Encampments of Homeless People Will Be Cleared*, N.Y. Times (Mar. 25, 2022), https://www.nytimes.com/2022/03/25/nyregion/eric-adams-homeless-encampments.html; Karen Yi, *Mayor Adams' Homeless Encampment Sweeps Reached New High Last Fall*, Gothamist (Apr. 8, 2024), https://gothamist.com/news/mayor-adams-homeless-encampment-sweeps-reached-new-high-last-fall.

[32] *See* Kaiser-Schatzlein, *supra* n.29; Yi, *supra* n.27.

[33] *See* Yi, *supra* n.27.

sites, either temporarily or permanently, and move from site to site under constant threat of being swept.[34]

55.     In addition, sweeps teams often arrive early in the morning, which negatively affects homeless residents' ability to sleep as they do not know when they are going to be woken up and moved along.  This causes them to experience anxiety and hypervigilance in their day-to-day lives.[35]

56.     Homeless residents have reported that the presence of numerous armed NYPD officers at sweeps causes them to feel intimidated, distrustful, and fearful for their personal safety. At times, they have reported agents belonging to other City agencies, including DHS and DSNY, who have heightened their fear and other recurring triggers.

57.     Sweeps have serious ramifications for the health of homeless New Yorkers.  The City has carried out sweeps during the height of winter and removed blankets, tarps, warm clothing and other belongings that Plaintiffs require to survive in sub-freezing temperatures.  The City has also swept homeless residents during heavy rain and flooding, destroyed their belongings, and displaced them from sites where they were sheltering from the rain.  The City carries out sweeps during heatwaves, forcing people to leave shaded sites that offer protection from the harsh sun.[36]

---

[34] *See, e.g.*, Karen Doran et al., *Overdose and Homelessness – Why We Need to Talk About Housing*, JAMA Network Open (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2787718 ("[c]onstant movement, as induced by frequent street or encampment sweeps, makes connecting to resources and supports even more difficult").

[35] Dean Moses, *Living in Fear: How NYC's Homeless Struggle with Anxiety Amid Ongoing Encampment Evictions*, AMNY (Apr. 5, 2022), https://www.amny.com/news/nyc-homeless-strugle-anxiety-encampment-evictions.

[36] A study of the criminalization of homelessness in Denver found that depriving people of life-sustaining belongings led to a significant increase in health issues caused by exposure to the elements, such as frostbite, heatstroke and dehydration.  *See* Marisa Westbrook & Tony Robinson, *Unhealthy By Design: Health and Safety Consequences of the Criminalization of Homelessness*,

On or around September 29, 2023, for example, the City conducted a sweep of eight Spanish-speaking homeless individuals near the Brooklyn Queens Expressway during a local state of emergency caused by flash flooding and heavy rain, forcing them to move from their location under an overpass where they had found shelter.

58.    Sweeps have prevented homeless New Yorkers from seeking out critical medical care or attending important court dates due to fear that the City will arrive unannounced and destroy all of their possessions.

59.    Homeless New Yorkers with existing physical conditions or injuries have also reported that sweeps have exacerbated those conditions as the City forces them to hurriedly transport heavy items during sweeps, and often disposes of medical equipment and medications needed to treat their conditions.

60.    Sweeps have also inflicted lasting physical and psychological damage on each of the individual Plaintiffs.  The experience of being directed to leave their sites and then forced to watch as the City disposes of all their worldly belongings is deeply traumatizing, let alone having this occur repeatedly.

61.    By displacing homeless New Yorkers from City or State-controlled public lands and forcing them to perpetually relocate, homeless sweeps prevent the formation of community ties, jeopardize people's current and prospective employment, and have an incredibly destabilizing effect on the lives of this highly vulnerable population, making it even more difficult for them to

_____

30 J. Soc. Distress & Homelessness 107, 111–12 (2020); *see also* Chang et al., *Harms of Encampment Abatements on the Health of Unhoused People*, SSM – Qualitative Research in Heath 9 (Dec. 2022), https://www.sciencedirect.com/science/article/pii/S2667321522000269 ("unhoused people's health is harmed directly through encampment sweeps, or through the perilous social environmental conditions created by them").

obtain housing and exit homelessness.[37]

62.    The upshot of this policy or custom is that, in the midst of a housing and eviction crisis, the City is depriving homeless people of items that are critical to their human survival and displacing them from sites where they have sought shelter.

## II.    New York City Has a Persistent and Widespread Policy or Custom of Conducting Homeless Sweeps in a Way that Violates the Civil and Constitutional Rights of Homeless New Yorkers

63.    DHS-PB-2024-011 ("DHS Sweeps Policy"), revised in 2020, 2022, and most recently in June 2024, is the City's primary agency-level written policy that sets out the process for conducting sweeps.  The policy authorizes representatives of City agencies, including in partnership with SDOT and NYCEDC, to displace homeless residents—by requiring people to remove themselves from their site while the City "cleans" the area—and dispose of any personal belongings left behind.

64.    Per the policy, sweeps are carried out by DHS and "its partner agencies."  These include the NYPD, DSNY, the Parks Department, CDOT, SDOT, and NYCEDC, depending on the location of the sweep. SDOT's inclusion as a named partner agency in the policy results in its involvement in  some portion of annual sweeps—particularly those sweeps that occur in proximity to city freeways, bridges, underpasses, and other State-controlled public property.

65.    The DHS Sweeps Policy categorizes homeless sites into "encampments," "pop-

---

[37] *See* Samir Junejo et al., *No Rest for the Weary: Why Cities Should Embrace Homeless Encampments*, Homeless Rights Advocacy Project (2016) 4, https:// digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi? article=1006&context=hrap ("Disrupting encampments harms residents by taking away the safety of community, and forcing them into a daily nightmare of searching for security, shelter, and food, making it impossible to focus on longer-term measures to end their homelessness.").

ups," and "hotspots," which are very broadly defined.[38]   The City performs "cleanups" of "encampments," "pop-ups," and "hotspots."

66.    The policy further distinguishes between "cleanups" and "emergency cleanups."

67.    "Cleanup" is defined as "[a] multi-agency operation to address illegal, unsanitary, or unsafe street conditions AND give people who are unsheltered access to social services, housing, and other help."

68.    "Emergency cleanup" is defined as "[a] multi-agency cleanup operation done without notice or with minimal prior notice due to conditions that pose a potential health and safety risk to people who live there or the public."

69.    In addition to the DHS Sweeps Policy, partner agencies involved in sweeps have their own internal policies and procedures that prescribe processes to be followed during sweeps. These include, but are not limited to, the NYPD's "Homeless Encampment Guidelines" and DSNY's "Homeless Individuals Cleanup Procedures."

70.    DHS periodically issues new iterations of its sweeps policy which are assigned unique policy numbers.  Each version of the policy enacts changes to the process for conducting sweeps, however, the fundamentals of the policy have remained the same across each revision. Each version of the DHS Sweeps Policy has been facially inadequate and unlawful.

71.    While the DHS Sweeps Policy sets forth the processes to be followed by DHS and its partner agencies when conducting sweeps, in practice, the City has consistently failed, and

---

[38] An "encampment" is defined as "[a] fixed or temporary physical structure built or set up as a shelter or dwelling in an area not meant for people to live, such as areas without sanitation services, water, trash removal, etc."  A "pop-up" is defined as "[a]n area not meant for people to live where individuals and groups regularly sleep without fixed comforts (*e.g.*, furniture, standing structures, curtains, mattresses)."  A "hotspot" is defined as "[a]n area not meant for people to live where groups of people who are unsheltered gather regularly."

continues to fail, to comply with this policy in various ways.  In addition, the City, including with their New York State sweeps partner agency SDOT, has a persistent and widespread practice and custom of conducting sweeps in ways that are both unconstitutional and which deviate from the written policy.  The ways in which the City has carried out sweeps in practice, and importantly the way in which it has violated the legal and constitutional rights of homeless New Yorkers, have remained materially the same across each iteration of the written policy.  The DHS Sweeps Policy, related policies and procedures of partner agencies, and the City and SDOT's and NYCEDC's widespread practices and customs during sweeps collectively constitute the *de facto* sweeps policy at issue in this case.

     **A.**     **Pre-Sweep, Including Notice Requirements**

72.     According to the DHS Sweeps Policy, the DHS Joint Command Center ("JCC") coordinates the interagency response to reports of homeless individuals residing in public, which the City describes as "requests to assess areas that may be hotspots, pop-ups, or encampments." A key source of these "requests to assess" are 311 reports, however, some reports are made directly to the JCC via phone or email.

73.     Under the current policy, the NYPD makes the final determination as to whether a site should be swept.

74.     The DHS Sweeps Policy dictates that, unless it is an "emergency cleanup," homeless residents are to be given written notice in advance of the sweep.  According to the policy, sweeps typically take place 48 to 96 hours after they are scheduled for "cleanup." In the 2024 revisions to the policy, it notes that the date the notice is posted and the date when the cleanup will commence must be at least 14 days apart. It is not clear how this relates to the 48 to 96 hours' notice set out in the same policy.

75.     The City routinely does not provide adequate, timely notice to homeless residents

prior to a sweep when following the written policy and when it deviates from the policy.

76.     As illustrated through the experiences of the individual Plaintiffs, referenced below, the City does not post notices 14 days prior to a scheduled sweep. Homeless residents are often given significantly less than 96 hours' notice before a sweep takes place—it is very common for the City to post a notice the day prior to a sweep.  Other times, a sweeps team will arrive on a date other than the date specified in the notice.  In many cases, as has been the case for each of the individual Plaintiffs, people receive no notice at all.

77.     The policy instructs outreach teams to distribute copies of notices to anyone present and post them in visible locations at the site assigned to be swept as part of a "standard cleanup."

78.     The standard form notice provided by the City informs homeless residents that there will be a "clean-up" of the site, instructs people to remove their belongings, notifies them that "items of readily apparent value or containing personal identifying information may be stored for safekeeping by the city," and states that if residents are not present at the sweep any remaining belongings will be disposed of.  It also notifies residents of the process for self-referring to congregate shelter and applying for an HRA storage grant.  The notice does not offer information on what takes place during a "cleanup," nor does it advise residents of the risk that their property may be disposed of even if they are present at the sweep.  The notice does not state the basis for the sweep or provide a legal or administrative mechanism for residents to contest the sweep.

79.     Because sweeps notices instruct homeless residents to remove their belongings, and by extension, themselves, from their sites, this causes some homeless residents to leave their sites prematurely after receiving a sweeps notice to avoid losing their belongings and/or being threatened with arrest, as alleged by both Plaintiff Damian Voorhees and Plaintiff Bethany Hine.

80.     Sweep notices notify residents of the date when a sweep will occur but do not state

an approximate time, so residents do not know at what point during the day a sweep will take place.  Not infrequently, even when the date of a sweep is specified on a notice, the sweeps team arrive on a date other than that specified.  This happened, for example, to Plaintiff Antonia Hayes, on or around May 1, 2024, when the City swept her and her belongings one day prior to the scheduled sweep date, as alleged in further detail below.  Upon information and belief, the failure to notify residents of an approximate time and accurate date causes residents to miss appointments, such as medical appointments or court dates, in order to protect their belongings from being unlawfully seized and destroyed by the City, which can have detrimental medical and legal consequences. Alternatively, some homeless residents have no choice but to leave their belongings unattended and risk the City unlawfully seizing their belongings in their temporary absence.

81.    The DHS Sweeps Policy instructs outreach teams to post notices "with both sides showing to help people get the information in their preferred language." On occasion, outreach teams will post notices in both English and Spanish, however, they rarely make attempts to confirm the languages spoken by residents at a site scheduled to be swept. Further, the City does not appear to post sweeps notices that have been translated into languages other than English and Spanish and, upon information and belief, does not offer interpretation services at sweeps.

82.    Additionally, the DHS Sweeps Policy authorizes the City to conduct a sweep the same day with minimal to no prior notice if it is designated an "emergency cleanup."  The policy contains a very broad list of circumstances that constitute an "emergency" for notice purposes, which includes the existence of an encampment in a "high-traffic area" and where a service request is made by "Commissioner-level City official or above."  Terms like "high-traffic area" are not defined anywhere in the policy, which gives agency representatives vast discretion in determining when to conduct no-notice "emergency" sweeps.

83.     As experienced by each of the Individual Plaintiffs on many occasions, and as alleged in further detail below, the City carries out a high volume of "emergency" sweeps without providing any advance notice.  As alleged by Plaintiff Trese Chapman, for example, the City's failure to provide proper notice meant that she could not attend to important appointments, like replacing her social security card, due to the risk they would seize her belongings while temporarily absent from her site.

84.     The DHS Sweeps Policy also states that, before a site is swept, JCC will dispatch outreach teams to make offers of services to "talk to clients about their options and answer questions."

85.     Upon information and belief, outreach teams often do not visit sites in advance of sweeps and, to the extent they do, they only do so to post sweeps notices.  As alleged by the individual plaintiffs, they very rarely engage with homeless residents, much less answer any questions about the nature or reason for the sweep or give them meaningful information about housing or other services.

**B.     During Sweeps**

86.     At the commencement of a sweep, the DHS Sweeps Policy instructs sweeps teams to offer social services to residents, explain the "cleanup" process, and notify them to retain "important documents and anything valuable because things left behind may be discarded."  The policy states that DSNY commences the "cleanup" after residents leave the site and disposes of any remaining property.

87.     According to the policy, DHS instructs homeless residents to leave their site.  They must "give occupants a reasonable amount of time to leave the immediate area and take their property."

88.     The policy sets out a "property safeguarding and vouchering" system for items that

24

are deemed "eligible personal property" and stipulates that "DHS must supply free temporary storage for eligible items for 90 days from a person's request."

89.    The policy contains a list of "property eligible for storage," which includes personal papers, prescription medication, jewelry, eyeglasses, medical equipment, backpacks, suitcases, functional electronics, tents, functional bicycles, and "[a]ny other item of reasonable value that an occupant asks to store and can be stored safely and transported."

90.    The policy also contains a list of ineligible property that will not be stored, which includes "non-medical foods or liquids of any kind, perishable or otherwise," "furniture/small appliances," "mattresses," "shopping carts," and "visibly contaminated property."  The policy states that locked containers may be stored at the agency's discretion.  Under the written policy, DSNY will dispose of ineligible property on DHS' instruction.

91.    The DHS Sweeps Policy sets out a process by which DHS must voucher and store people's personal belongings, including inventorying eligible property, photographing it, and sealing it in a labeled container provided by DHS.  According to the policy, residents who elect to store property with DHS will be given a voucher containing the details of their stored property and how to retrieve it.

92.    The retrieval information on the sample voucher annexed to the policy dictates that homeless residents must call the JCC to coordinate pick up, appear in person to collect their property, and present proper identification at the time of pick up.  This is impractical for many street homeless New Yorkers as they often do not have working phones and/or proper identification.  Neither the policy nor the sample voucher states where the property is stored so property owners can only locate their property by calling the JCC.  The DHS Sweeps Policy also suggests that property owners must identity the items in storage before DHS will return it to them.

After 90 days, DHS will discard any property that hasn't been retrieved without further notice. The DHS Sweeps Policy does not appear to allow property owners to periodically access their belongings while keeping them in storage.

93.     In practice, as illustrated through the experiences of the individual Plaintiffs, once a sweep team arrives, they often do not give residents a reasonable opportunity to gather their belongings as instructed by the DHS Sweeps Policy.  Instead, City agencies simply force homeless residents to leave their sites and the City proceeds to indiscriminately throw their belongings into a sanitation truck, sometimes within minutes of their arrival.

94.     Most of the time, as consistently alleged by all of the individual Plaintiffs, people are instructed to "take what they can carry" in a single trip before City workers begin seizing their remaining belongings.  The City will often not permit others to assist in transporting people's belongings and will prevent people from carrying their property away in multiple trips.

95.     Other times, the City won't allow people to take any of their belongings with them and/or they restrict the type of belongings that people are permitted to carry, instead disposing of those belongings by throwing them in a sanitation truck.  As alleged by Plaintiff Voorhees, for example, the City prevented him from taking several items, including a sleeping mat and foam mattress with him as he was forced to leave his site during a sweep on or around October 8, 2024. As alleged by the individual Plaintiffs, sweeps teams generally do not attempt to distinguish between homeless residents' personal property and actual trash.

96.     As alleged by each of the individual Plaintiffs below, the City routinely seizes and destroys life-sustaining belongings such as warm clothing, bedding, personal documentation, medications, tarpaulins, and other valuables, making it significantly harder for them to survive outdoors.

97.     The City does not "use best efforts to retain and voucher occupants' eligible personal property for temporary storage" or "make every effort" to explain the storage and vouchering process as instructed by the DHS Sweeps Policy.  The City neither routinely offers to store nor actually stores and vouchers people's personal belongings when conducting sweeps.  The City has not properly implemented the storage and property vouchering procedure as set out in the DHS Sweeps Policy.  As alleged by the individual Plaintiffs, all of whom have experienced dozens of sweeps, the City has not once stored their personal belongings during a sweep.

98.     If a homeless resident is not present during a sweep, DHS is only required by the DHS Sweeps Policy to store eligible property if the property is "identifiable" (*i.e.*, it has a name that can be used to label such property, and they must make "reasonable efforts" to identify eligible property for storage).  "Reasonable efforts" do not include opening sealed or opaque containers. Sweeps teams are instructed to post a notice containing information about where personal property is being stored and the date by which DHS will dispose of unclaimed property.

99.     In practice, this never occurs.  As alleged by Plaintiff Ventura, Plaintiff Voorhees, Plaintiff Hine, and Plaintiff Hayes, all of whom experienced sweeps while physically away from their sites, the City will summarily dispose of the belongings of homeless residents who are absent from their sites and leave.  Sweeps teams do not provide any notification to absent residents as set out in the policy nor do they take steps to safeguard or store items that appear to be the personal property of homeless residents.

100.    As alleged by the individual Plaintiffs, the City—generally through NYPD officers—forcibly displaces homeless residents when conducting sweeps.  They tell people that they are required to leave the area and, in some cases, they inform residents that unless they permanently relocate, they will be repeatedly swept until they do so.

27

101.    The NYPD Homeless Encampment Guidelines specify that the NYPD's primary responsibility at sweeps is "maintaining site security." Typically, it is NYPD officers who force homeless residents to leave their site and prevent them from returning.

102.    As alleged by the individual plaintiffs, the City also does not offer assistance to homeless residents with applications for HRA storage grants during sweeps, which are generally required to be done either online or in person. This is a lengthy and complicated process that often takes as long as 30 days and, if not done in person, typically requires a working phone with internet access and active phone service, which not all homeless residents have consistent access to. Applying for a storage grant in person at an HRA benefits access center also poses significant logistical problems because many homeless residents cannot leave their belongings unattended for long periods. Individuals typically can't make appointments in advance and so may experience long wait times.

103.    In the event that a homeless resident is able to place certain items in storage, that does not address the fact that homeless residents need many of the items that are permanently seized during sweeps to survive outside.

## C.    Post-Sweeps

104.    Neither the City, nor any of its partner agencies, including SDOT and NYCEDC, provide any post-deprivation mechanism for reclaiming personal property that they seize because they destroy people's personal belongings by throwing them in the back of a sanitation truck and compacting them.

105.    Neither the City, nor any of its partner agencies, including SDOT and NYCEDC, offer homeless residents compensation or a mechanism for seeking compensation for their personal property that is seized and destroyed by the City.

106.    The DHS Sweeps Policy instructs sweeps and outreach teams to "take steps to

prevent former occupants or other people from returning and reestablishing the encampment."

107.    Upon information and belief, agency representatives, including NYPD officers, will sometimes return to canvass a site and move street homeless residents along after a sweep. As alleged by the individual Plaintiffs, NYPD officers will also physically remain at the site to prevent residents from returning.  For example, NYPD officers remained at Mr. Bethel and Ms. Chapman's site after a sweep on or around June 13, 2024.  In other cases, data produced by DSS and DSNY shows that they will conduct repeated sweeps over the course of a few days or weeks to force street homeless residents to permanently relocate.

108.    The DHS Sweeps Policy also instructs sweeps and outreach teams to include the "cleaning partner" accompanying them to a sweep in a post-cleanup summary report. SDOT and NYCEDC are among the list of partner agencies that are authorized to engage in sweeps activities.

### D.    Perennial Encampments

109.    The DHS Sweeps Policy contains specific rules for conducting sweeps of "perennial encampments." A "perennial encampment" is defined as a "site prone to recurring encampment establishment." This determination is based on "observation of multiple instances of reestablished encampments at the same location within a 30- day period from the last cleanup; or observation of a subsequent encampment within a 250-foot radius of a previously cleaned encampment within a 30- day period."

110.    The DHS Sweeps Policy states that to prevent the reestablishment of encampments, it will provide "extended public notification… for up to 14 days prior to the cleanup," deploy outreach teams, conduct sweeps within less than 14 days if there is an "imminent risk to public health, safety, or security," perform "extended cleanup of the site at the same location or the surrounding 250-foot proximity where an encampment is re-established during a 30-day period," and prevent trespassing "within their authority and discretion."

**III.    Sweeps Do Not Advance Legitimate Governmental Objectives**

111.    The DHS Sweeps Policy states that the sweeps aim to "assess and provide compassionate, resource-intensive outreach to help unsheltered people access social services, *i.e.*, shelter, financial support, or help with health and mental health issues and substance use/abuse issues" and "clear temporary physical structures … in public spaces not meant for people to live."

112.    The 2024 revision to the DHS Sweeps Policy adds a third goal, which is to "supply limited, temporary storage for eligible personal items removed from encampment sites and stored safely for up to 90 days." As stated above, neither the City, SDOT, nor NYCEDC  do not in practice routinely provide temporary storage for people's personal belongings.

113.    Although not listed as a specific goal of the sweeps, the introduction to the policy also states that sweeps are performed to "reduce health and safety risks from garbage, debris, hazardous materials, and other unsanitary conditions."

114.    In reality, sweeps do not advance these goals and there is no correlation between the unconstitutional conduct the City and its partner agencies, including SDOT, and NYCEDC engage in during sweeps and the stated objectives of sweeps.

**A.    Sweeps Operations Do Not Connect Homeless New Yorkers with Important Social Services, Including Housing**

115.    Contrary to its stated goal of providing aid to homeless New Yorkers by connecting them to social services and helping them access emergency shelter and permanent housing, sweeps rarely result in connecting homeless people with the services they need for at least four reasons. First, sweeps are not carried out in a way that is designed to achieve this goal.  Second, sweeps actually make it more difficult for homeless people to access services.  Third, the City has access to evidence that sweeps are ineffective as a vehicle for connecting people with shelter and housing. And fourth, the City engages in conduct that is inconsistent with the goal of service provision,

30

which casts serious doubt on the veracity of this as a governmental objective.

116.    There is no rational relationship between the behavior of City and its partner agencies, including SDOT, and NYCEDC, during sweeps and the goal of connecting homeless New Yorkers to services like emergency shelter and permanent housing.  To the contrary, there is a fundamental disconnect between taking someone's belongings and/or displacing them from sites where they have sought shelter and increasing their access to services.  Accordingly, it is clear that sweeps are not designed to "help unsheltered people access social services."

117.    Perversely, sweeps actually make it harder for homeless New Yorkers to access services because the City destroys vital documentation and personal identification required for permanent housing placements, including apartments obtained through the Department of Housing Preservation and Development ("HPD"), apartments obtained using CityFHEPS vouchers, and supportive housing, some of the primary housing programs available to homeless New Yorkers. Plaintiffs and other homeless New Yorkers have had Electronic Benefit Transfer ("EBT") cards, birth certificates, social security cards, driver's licenses, passports, State identification cards, and other personal documentation seized and destroyed during sweeps.

118.    By continuously throwing away street homeless peoples' life-sustaining belongings and displacing them from their sites, sweeps have led to a total breakdown of trust between homeless New Yorkers and outreach workers, such that connecting them with services becomes more difficult.[39]

---

[39] The New York City Comptroller's Office published a policy report in June 2023 to accompany the Comptroller's Sweeps Audit ("Comptroller's Policy Report").  *See* NYC Comptroller, *Housing First: A Proved Approach to Dramatically Reduce Street Homelessness* (June 2023) 7, https://comptroller.nyc.gov/wp-content/uploads/2023/06/Brief-Report_Housing-First.pdf ("The sweeps, which may result in people's belongings being thrown away, including medication and personally valuable items, have eroded trust between those living unsheltered on the street and City workers and nonprofit outreach staff.").

119.    Sweeps also make it difficult for homeless people to stay connected to outreach teams who can facilitate access to low-barrier shelter placements because the City, including at times in conjunction with the SDOT and NYCEDC, forces them to constantly relocate.  This also prevents outreach teams from ascertaining residents' long-term chronic homelessness, which significantly reduces the likelihood that street outreach teams will offer them safe haven and stabilization beds as they typically prioritize individuals they see repeatedly.  In fact, DHS recently issued a new policy restricting access to safe haven and stabilization beds to individuals' who have more than six months of *documented* street homelessness.  It also impedes homeless residents' ability to get assigned to an outreach case load, which can give them access to permanent housing support and is an eligibility requirement for a CityFHEPS voucher.

120.    The City has access to clear and convincing evidence that sweeps do not achieve the goal of connecting homeless people with services.  An audit performed by the New York City Comptroller assessing DHS' role in sweeps of homeless encampments ("Comptroller's Sweeps Audit"), released in June 2023, found that DHS had "limited success" in facilitating shelter placements for homeless individuals subject to sweeps.  Of the 2,308 homeless individuals present at sweeps during an eight month period between March 21, 2022, and November 30, 2022, 119—roughly 5%—accepted temporary shelter placement, 29 immediately left the shelter without spending a single night, and only three obtained permanent housing.[40]

121.    In addition, the City conducts itself in a manner that is inconsistent with the goal of facilitating access to services.  The Comptroller's Sweeps Audit found that DHS does not adequately track its outreach activity at sweeps in that it does not maintain records of the outreach

---

[40] Maura Hayes-Chaffe, *Audit of the Department of Homeless Services' Role in the "Cleanups" of Homeless Encampments*, NYC Comptroller (June 28, 2023) 7, https://comptroller.nyc.gov/wp-content/uploads/documents/ME23_059A.pdf.

services it offers to homeless residents. In fact, the only data captured by DHS during the relevant eight-month period was the number of people present at a site being swept and the details of individuals who accepted shelter placements.[41]

122.    Accordingly, outreach teams had no understanding of whether the people being swept required services, whether they have rejected service offers in the past or why, and whether their service needs had been assessed.

123.    As alleged by the individual Plaintiffs, representatives of DHS *never* make offers of permanent housing to street homeless New Yorkers during sweeps. Even if a homeless resident is offered and accepts placement in a shelter at a sweep, they are transported or directed to a drop-in center, which does not have sleeping facilities. There they may wait for days before being offered a bed in a congregate shelter, a type of shelter accommodation that lacks privacy and is notoriously unsafe.

124.    Accordingly, it is clear that sweeps do not facilitate access to housing or other important social services for homeless New Yorkers.

**B.    The City Conduct at Sweeps is not Rationally Connected to the City's Stated Goals of Clearing Structures and Addressing Sanitation Conditions**

125.    The City purports to carry out sweeps for the purpose of clearing temporary physical structures in public spaces and, as a secondary goal, to address sanitation conditions at sites where homeless people reside, which it has categorized as "encampments," "pop-ups," and "hotspots." The City, however, primarily sweeps sites that do not feature structures of any kind and consistently disposes of personal property that does not constitute a structure and does not pose a health or sanitation risk.

126.    Crucially, the City carries out many sweeps of homeless sites that do not feature

---

[41] Hayes-Chaffe, *supra* n. 38, at 9–10.

structures of any kind, including tents.  Of the 2,154 sweeps carried out by the City and examined by the Comptroller's Office, only 161 sites were classified as "encampments," while 1,093 were designated as "pop-ups."[42]  While the City defines an encampment as a site with a "fixed or temporary physical structure built or set up as a shelter or dwelling," pop-ups are defined by reference to a lack of "fixed comforts (*e.g.*, furniture, standing structures, curtains, mattresses)

127.    The City also summarily destroys items that are not creating an obstruction. Despite many homeless residents, including all of the individual Plaintiffs, making sure to store their belongings in a way that does not obstruct sidewalks or other public thoroughfares, they have nonetheless experienced the seizure and destruction of these belongings. Plaintiff Ventura, Plaintiff Hayes, and Plaintiff Hine, for example, were routinely swept when they did not have any physical structures at their sites and were not obstructing the sidewalk with their belongings.

128.    In addition, as alleged by the individual Plaintiffs, the City routinely sweeps sites where there are no health and safety hazards.  The City generally does not distinguish between people's personal property and actual trash that has accumulated when disposing of items during a sweep.  Sweeps teams invariably dispose of everything remaining at a site regardless of whether it carries sanitation risks.

129.    UJC-SNP has repeatedly replaced homeless residents' personal belongings such as protective coverings, sleeping cots, umbrellas, bedding, art supplies, and clothing that the City has seized and destroyed during a sweep, none of which pose a health and safety risk.  Then, in subsequent sweeps, the City has again seized and destroyed those items.

130.    The City's unconstitutional behavior during sweeps cannot be justified by sanitation-related goals because there is a significant disjunction between addressing sanitation

---

[42] Hayes-Chaffe, *supra* n.38 at 5.

conditions and disposing of personal property that does not pose public health concerns.

131.    Ultimately, the City's conduct at sweeps does not bear any relation to the City's stated goals of dismantling illegal structures and addressing sanitation conditions.

## IV.    **Prior Notice**

132.    The City is well aware of the fact that sweeps teams across the City are summarily disposing of street homeless New Yorkers' personal property without a warrant and without due process of law and displacing homeless New Yorkers from their sites.

133.    There have been numerous media reports regarding the harmful practices that take place during sweeps, including people's belongings being thrown into the back of sanitation trucks without any means of tracing their whereabouts.[43]

134.    As early as 2016, the City has been fielding legal complaints from homeless New Yorkers about the erroneous deprivation of their belongings during sweeps.  In 2016, three street homeless individuals filed notices of claim against the City of New York alleging an inter-agency sweeps team had kicked them awake in the early hours of the morning in October 2015 and forcibly disposed of their belongings.[44]  The City made settlement offers to these three men to compensate them for the property that the City had unlawfully seized and destroyed.

135.    Plaintiff UJC-SNP has engaged in written and verbal communications with DHS in

---

[43] *See, e.g.*, Jeff Coltin, *New York City Workers Keep Throwing Out Homeless People's Belongings*, City & State (Apr. 5, 2022), https://www.cityandstateny.com/politics/2022/04/new-york-city-workers-keep-throwing-out-homeless-peoples-belongings/364018; Leonard Greene et al., *Critics Say Mayor Adams Didn't Learn Lesson From 9,000 Homeless Encampments Torn Down by de Blasio*, NY Daily News (Mar. 31, 2022), https://www.nydailynews.com/2022/03/31/critics-say-mayor-adams-didnt-learn-lesson-from-9000-homeless-encampments-torn-down-by-de-blasio.

[44] NYCLU, *NYCLU Settlement: City to Compensate Homeless People for Destroyed Possessions* (Jan. 4, 2017), https://www.nyclu.org/en/press-releases/nyclu-settlement-city-compensate-homeless-people-destroyed-possessions.

which it has notified DHS of the City's harmful conduct during sweeps.

136.    UJC-SNP staff are also physically present at some sweeps and notify agency representatives of the need to safeguard residents' personal belongings due to the likelihood that the City will dispose of their property.

137.    Given the widespread non-compliance with many aspects of the DHS Sweeps Policy, the City has also clearly failed to properly train its staff and the staff of partner agencies, including SDOT and NYCEDC, on how to comply with its own policies.

## PLAINTIFFS' EXPERIENCES

### I.    Urban Justice Center – Safety Net Project

138.    UJC-SNP is a nonprofit organization that provides direct services to homeless New Yorkers.

139.    Defendants' wrongful action in conducting sweeps frustrates UJC-SNP's core mission to ensure access to safe and affordable housing and essential benefits for all, strengthen the social safety net, and advocate for government policies and practices that respect the dignity of homeless and low-income New Yorkers.

140.    UJC-SNP has an interdisciplinary benefits and homeless advocacy team composed of advocates, outreach workers, organizers, social workers, an attorney, and a law fellow.  As such, it provides a wide range of services to homeless New Yorkers.

141.    As a result of the City's homeless sweeps, UJC-SNP has had to divert organizational resources away from securing permanent housing, public benefits, and other services for homeless individuals towards offering assistance to people who experience sweeps by: advising homeless residents of their rights during sweeps, attending sweeps in-person to prevent property loss, using organizational funds to replace items that were seized during a sweep, and assisting residents with replacing personal identification and other documents that they need

to apply for housing or obtain public benefits.

142.    Sweeps also have a disruptive impact on UJC-SNP's ability to facilitate access to housing subsidies, such as CityFHEPS, complete Homeless Housing Applications, and advocate on public benefits issues for homeless New Yorkers because the City consistently returns to sites where UJC-SNP's clients reside, destroys their belongings, and forces them to relocate.  This makes it extremely difficult for UJC-SNP to maintain contact and stable communication with their street homeless clients and negatively affects UJC-SNP's ability to provide them with a range of services.

143.    Sweeps have a dual effect of redirecting the attention of UJC-SNP clients away from obtaining permanent housing and other critical services toward their continued survival on the street, as well as creating administrative barriers due to the loss of crucial personal documentation required to submit housing applications. This results in the expenditure of additional organizational resources on case management and advocacy services for each given case where the client is a homeless resident experiencing sweeps.

144.    UJC-SNP staff have worked with more than 100 homeless New Yorkers who have experienced sweeps. Between April 2021 and October 2024, UJC-SNP staff members attended more than 90 sweeps and utilized roughly $17,449.58 in client assistance funds to cover storage costs for homeless individuals facing the loss of their belongings in sweeps. UJC-SNP also directed roughly $1055.48 in discretionary homeless funds to replace personal belongings seized during a sweep.

145.    UJC-SNP staff members also spend many hours assisting homeless clients with addressing the consequences of sweeps, including by helping clients submit applications to replace personal documents, obtaining HRA storage grants, communicating with street medical teams to

replace medications or prescriptions that were lost, and purchasing bedding, clothing, protective coverings, and other life-sustaining belongings.

146.    Because UJC-SNP clients are often repeatedly swept, they have lost replacement items that UJC-SNP purchased for them in subsequent sweeps, which means that UJC-SNP staff members must spend time and additional funds replacing those items again.  These items include sleeping cots, bedding, protective coverings, clothing, art supplies, and umbrellas, none of which are items that cause sanitation concerns.

147.    UJC-SNP participates in coalition groups and liaises with other nonprofit organizations regarding the impact of sweeps on New York City's homeless population.

148.    UJC-SNP has spent time and resources developing know-your-rights material to distribute to homeless residents who experience sweeps.

149.    UJC-SNP also offers feedback and is involved in the drafting of legislation intended to combat the adverse effects of sweeps on street homeless New Yorkers.  This includes Intro. 1153, a bill passed by the New York City Council in December 2023 that imposes public reporting obligations on New York City agencies regarding sweeps.

150.    Because sweeps require a multifaceted response, UJC-SNP has dedicated a broad range of resources in the form of organizing, advocacy, legal services, material aid, and social work support to address the impact that sweeps have on its street homeless clients.  This inevitably detracts from its ability to dedicate those resources to other issues impacting its client base.

151.    Many UJC-SNP staff members work on public benefits as well as homeless advocacy cases.  Working with street homeless clients who experience sweeps can be more labor-intensive than other categories of clients, which means that advocates and social workers may have to take on a lower caseload to account for this and are therefore able to assist fewer clients overall.

152.    UJC-SNP's focus on sweeps-related work also means that its staff members have less bandwidth to concentrate on other areas that its clients and members would like to prioritize.

## II.    Gerald Bethel and Trese Chapman

153.    Plaintiffs Gerald Bethel and Trese Chapman have been homeless in New York City since in or around July 2023, after being forced to leave their apartment due to it being an illegal sublet, a fact previously unbeknown to them.  Mr. Bethel and Ms. Chapman have been in a relationship for roughly 11 years.

154.    They began residing at their site in Manhattan near Union Square in or around September 2023.

155.    Their site was located under some construction scaffolding along the side of a vacant building and their belongings were stored along the side of the building in a neat and tightly contained manner.  None of their belongings were obstructing the sidewalk or preventing the flow of foot traffic in any way, and Mr. Bethel and Ms. Chapman made every effort to ensure their site was free of trash.

156.    Between September and December 2023, they experienced at least six sweeps, including on or around September 18, September 25, October 2, October 4, October 10, and November 13.

157.    Starting in January 2024, the City began conducting weekly sweeps of their site, including but not limited to, on or around January 4, January 10, January 22, January 31, February 5, February 28, March 7, March 18, March 25, April 2, April 9, April 15, April 24, May 2, May 13, May 20, June 3, and June 13.  These sweeps continued to occur on an almost weekly basis from mid-June through October 2024.

158.    Between in or around January and March 2024, the City would typically provide advance written notice prior to a sweep.  They would typically provide anywhere from 12 hours'

to 48 hours' notice.

159.    The notices listed a date but no time so neither Mr. Bethel nor Ms. Chapman knew when they needed to wake up and/or start preparing for the sweep.

160.    Outreach workers would often post notices while they were sleeping.  To the extent they posted notices when they were awake, DHS workers did not offer services or provide any details regarding the upcoming sweep.

161.    Between March and June 2024, the City started to perform some of these sweeps without prior notice.

162.    In or around June 2024, the City started to consistently conduct sweeps without any prior notice.

163.    City representatives informed Mr. Bethel and Ms. Chapman that they no longer needed to provide notice because they were what they deemed "chronically homeless."  This meant that they did not have a meaningful opportunity to prepare for the sweep or take steps to safeguard their personal belongings.

164.    The sweeps teams would be typically composed of three DSNY workers, including a DSNY supervisor, two to three NYPD officers, and one or two DHS workers.

165.    Starting in or around June 2024, the sweeps team adopted a more aggressive approach when conducting sweeps and rushed them to pack up their belongings and relocate.

166.    When the sweeps team arrived at their site, which could be anywhere between 8am and 12pm, the NYPD officers would tell Mr. Bethel and Ms. Chapman to leave their site and take only what they could carry in one trip.

167.    Mr. Bethel and Ms. Chapman complied with the NYPD officers' orders to leave their site because they understood that if they did not, they would physically force them to move

or they would throw out all of their belongings without giving them an opportunity to safeguard their property.

168.     Mr. Bethel and Ms. Chapman understood that the City would throw out their property if they didn't leave because, on one occasion, they witnessed another homeless individual refuse to relocate during a sweep and the City seized all of his belongings and disposed of them in a sanitation truck.

169.     DHS never offered to store or voucher Mr. Bethel and Ms. Chapman's belongings; nor did they ever offer to assist with applying for an HRA storage grant.  In fact, the City expressly refused to store their belongings after Ms. Chapman inquired about it.

170.     On or around June 13, 2024, the City carried out a no-notice sweep of their site on Ms. Chapman's birthday.   The sweeps team consisted of two NYPD officers, DHS representative(s), and DSNY workers.  The NYPD officers told Mr. Bethel and Ms. Chapman that they needed to leave their site and could only take what they could carry in one trip.  Mr. Bethel and Ms. Chapman could not carry all their belongings in a single trip and were informed that their remaining belongings would be disposed of.  The City seized clothing, shoes, blankets, personal effects such as family photographs, books, notebooks, hygiene products, and jewelry and disposed of them by throwing them in the back of a sanitation truck and operating the compactor.  After the City completed the sweep, two NYPD officers remained across the road from their site for approximately 90 minutes.  Mr. Bethel and Ms. Chapman believed that if they returned to their site, the NYPD would force them to move again so they relocated to another less sheltered site on a windy street corner.

171.     On or around August 30, 2024, the City conducted a no-notice sweep of Mr. Bethel and Ms. Chapman.  At the time, they had moved their belongings down the block from their usual

site while Ms. Chapman was charging her phone at a LinkNYC kiosk.   They stored their belongings between the kiosk and edge of the sidewalk so they were not obstructing pedestrian traffic.  After inquiring about why they needed to move, an NYPD officer informed them that Ms. Chapman was blocking access to the LinkNYC kiosk, despite the fact that she was using it.  The sweeps team, composed of two NYPD officers, two DHS workers, and two DSNY workers, informed them that they were conducting an "emergency" sweep and that they could only take what they could carry in one trip and leave.  They also refused to store any of Mr. Bethel or Ms. Chapman's belongings, despite Ms. Chapman pointing out that DHS has an obligation to store their personal property.  They were permanently deprived of clothing, shoes, and hygiene products, which are particularly hard to replace because they are expensive and are not donated as frequently.

172.   The sweeps of Mr. Bethel and Ms. Chapman's sites escalated in the lead up to Labor Day 2024, when the City conducted three sweeps in the course of six days, on or around August 28, August 30, and September 2, 2024.  The City only provided advance notice prior to the Labor Day sweep, which was posted roughly only 12 hours prior to the sweep.

173.   The City carried out sweeps of Mr. Bethel and Ms. Chapman's site during inclement weather, including during heavy rain, and displaced them from their site, which was protected by scaffolding offering some protection against the elements.  On multiple occasions, the City forced Mr. Bethel and Ms. Chapman to move themselves and their belongings into the rain.

174.   Being swept repeatedly by the City has been deeply traumatizing for Mr. Bethel. Mr. Bethel suffers from bipolar disorder and post-traumatic stress disorder. Constant sweeps have triggered symptoms of his mental health conditions, caused him to feel severely depressed and impeding his ability to function in the aftermath of a sweep.

175.    Mr. Bethel has also been offered multiple jobs that he was unable to accept because he could not leave Ms. Chapman alone at the site; this is in part because she was unable to carry all of their belongings if the City were to conduct a sweep.

176.    Ms. Chapman also has diagnosed bipolar disorder and post-traumatic stress disorder.  Repeated sweeps have caused her to feel highly anxious and depressed.  Every time she sees a sanitation truck or NYPD sprinter van pass by, she feels severely distressed.  Sweeps, especially "emergency" sweeps, also prevented her leaving their site and attending to important personal matters, such as replacing her social security card.

177.    The only services that DHS offered Mr. Bethel and Ms. Chapman during a sweep were separate placements in congregate shelter, with no guarantee that they would be placed at shelters proximate to one another.  DHS repeatedly refused to offer them a joint shelter placement as they do not have a registered domestic partnership.  On a few occasions, DHS did offer them a couples' placement in shelter on the condition that they register their domestic partnership within ten days of entering shelter.  DHS made it very clear that they would not offer assistance in obtaining the identification documents needed to register their domestic partnership and that Mr. Bethel and Ms. Chapman would lose their shelter placement if they were not able to comply with this condition.  However, Mr. Bethel and Ms. Chapman are currently unable to register their domestic partnership as Mr. Bethel does not currently have any form of identification, including his birth certificate.  DHS refused to assist Mr. Bethel in replacing his birth certificate.  Accepting separate shelter placements was not a viable option for Mr. Bethel and Ms. Chapman, who have been together for approximately 11 years.

178.    Mr. Bethel and Ms. Chapman secured a couples' placement in a stabilization bed facility through the persistent advocacy of UJC-SNP and entered their placement on October 16,

2024.

179.    Due to the instability and precariousness of shelter placements, there is a substantial risk that Mr. Bethel and Ms. Chapman will return to street homelessness in the near future.  They have not yet been able to register their domestic partnership and have been told repeatedly by DHS that they would not be permitted to maintain their couples' placement long-term if they could not do so.  This means that there is a concrete chance that Mr. Bethel and Ms. Chapman will be forced back onto the street, where they will be subject to repeated sweeps involving the destruction of their personal belongings and forced displacement.

### III.    Antonia Hayes

180.    Plaintiff Antonia Hayes has been homeless for approximately ten years. She has resided in the West Village for the last four to five years and has since experienced at least 20 sweeps there.

181.    Ms. Hayes often moves between sites within the West Village because she is swept from one site or subject to a police-initiated "move along" order.

182.    During sweeps, the City has seized and destroyed her personal belongings, including items that have enormous sentimental value and are irreplaceable, such as the ashes of her deceased father, daughter, and son, the death certificate of her deceased son, the birth certificates of her children, and her personal artwork.

183.    The City has also permanently deprived Ms. Hayes of several cell phones, a brand-new laptop, clothing, shoes, and bedding.

184.    The City has also forcibly taken Ms. Hayes' personal identification documents, including her birth certificate, social security card, and New York State Identification card. She has not been able to replace those documents and currently does not have any form of identification.

44

185.    Not having photo identification has made it challenging for Ms. Hayes to access services, including medical services.

186.    The City has also summarily seized and destroyed Ms. Hayes' Supplemental Security Income Direct Express card and Electronic Benefits Transfer ("EBT") card during a sweep.

187.    Ms. Hayes uses her EBT card to access her public benefits. Because the City disposed of her EBT card during a sweep, she could not access her SNAP benefits and had her public assistance case closed.  She has been unable to purchase food while she is trying to replace her EBT card and reopen her case.

188.    Of the many sweeps Ms. Hayes has experienced, over half have taken place without advance written notice by the City.

189.    When the City has provided advance written notice, they have typically provided between 12 to 24 hours' notice, and on a few occasions, up to four days' notice.

190.    On at least one occasion, on or around May 1, 2024, the sweeps team performed a sweep on the day prior to the date indicated on the sweeps notice while Ms. Hayes was temporarily absent from her site.  She returned to her site to find an interagency sweeps team disposing of her belongings, despite her attempt to intervene and save her belongings.

191.    In or around June 2024, representatives of the City informed Ms. Hayes that they would likely be conducting no-notice sweeps with respect to her moving forward.  Repeated no-notice sweeps and sweeps on short notice prevent her from taking steps to safeguard her personal belongings.

192.    Typically, during a sweep, the City instructs Ms. Hayes to take only what she can carry in one trip.  At times, it is not possible for Ms. Hayes to transport all of her belongings in

one trip. In those cases, the City rarely allows her to gather the remainder of her belongings in a second trip. Instead, they dispose of them by throwing them in a sanitation truck.

193.    Sweeps teams are typically composed of representatives from the New York City Police Department ("NYPD"), Department of Homeless Services ("DHS"), and either the Department of Sanitation ("DSNY") or Department of Parks and Recreation ("Parks Department"), depending on the specific location of her site.

194.    On many occasions, Ms. Hayes has witnessed the City throw her belongings in the back of a sanitation truck and run the compactor, instantly destroying her personal property.

195.    The City has never offered to store and/or voucher any of Ms. Hayes' personal property.

196.    The City has never offered Ms. Hayes any avenue for reclaiming belongings that they have seized during a sweep as they have instantaneously destroyed her personal property.

197.    During sweeps, the City often forces Ms. Hayes to leave her site while they conduct the sweep by telling her she has to move along. Typically, it is NYPD officers who enforce the instruction to leave her site. She often complies because she does not want to deal with a confrontation with the police and risk being arrested.

198.    The City has also swept Ms. Hayes during inclement weather, including snow, and deprived her of survival items like warm clothing.

199.    In May 2024 alone, the City swept Ms. Hayes and/or posted sweeps notices at her site on at least four occasions at her sites in the West Village including, but not limited to, on or around May 1, May 16, May 20, and May 29, 2024. Ms. Hayes also experienced at least 11 additional sweeps in the months of June, July, August, and September 2024 including, but not limited to, on or around June 5, June 10, June 26, early July, July 24, August 12, September 3,

46

September 17, October 22, October 24, and October 27, 2024.

200.    The City has swept Ms. Hayes while she was physically unwell.  During a sweep in or around mid-May, the City conducted a no-notice sweep of Ms. Hayes while she had pneumonia.  Due to physical weakness caused by her illness, Ms. Hayes was having difficulty moving her belongings, and the City subsequently seized and destroyed a suitcase and shopping cart full of her personal belongings as she tried in vain to transport them from her site independently.

201.    The City has seized Ms. Hayes' art supplies during a number of sweeps, including a no-notice sweep at a park in the West Village on or around May 29, 2024 where the City seized and destroyed two sets of brand new acrylic paints and two canvasses Ms. Hayes was painting for an art gallery that sets aside space for art made by homeless individuals.

202.    The summary destruction of Ms. Hayes' art supplies has been devastating for Ms. Hayes as she makes art to process her traumatic experiences residing on the street and to provide an emotional outlet.

203.    Ms. Hayes experienced several no-notice sweeps during July, August, and September 2024 during which the City seized and destroyed her personal property, did not offer to store or otherwise safeguard her personal belongings, and displaced her from her site.

204.    For example, in or around early July 2024, Ms. Hayes experienced a no-notice sweep in the early hours of the morning while it was raining.  During that sweep, the City seized many of her belongings including shoes, clothing, hygiene products, cosmetics, and photos of her stillborn daughter.  Ms. Hayes witnessed the City throw those belongings into the back of a sanitation truck and run the compactor.  The City only allowed her to take what she could carry in one trip and wouldn't allow her to return for the remainder of her belongings.  They did not offer

to store or voucher her belongings.  The sweeps team forced Ms. Hayes to leave her site under some scaffolding where she had sought shelter while it was still raining.

205.    During another sweep on or around August 12, 2024, the City seized and destroyed all of Ms. Hayes belongings while she was asleep at her site in a park, including clothing, a pair of sneakers, and a 24-pack of Crayola pencils that her UJC-SNP advocates had provided her to replace art supplies she lost during a previous sweep in or around May 2024.  The City did not provide advance notice of this sweep and did not leave any notification that a sweep had occurred and/or that they had taken her property.

206.    In September and October 2024, Ms. Hayes experienced no-notice sweeps in the park involving only the Parks Department, including, but not limited to, on or around September 3, September 17, October 22, and October 24, 2024.  During the September 3, 2024 sweep, the Parks Department seized and destroyed Ms. Hayes' clothing, shoes, bedding, and art supplies while she was using a public restroom.  During the September 17, 2024 sweep, a City representative from the Parks Department grabbed Ms. Hayes' and other residents' personal belongings and threw these belongings in a sanitation bin on wheels, claiming that it was an "emergency cleanup."  Ms. Hayes experienced similar sweeps on or around October 22 and October 24, 2024, during which the Parks Department permanently deprived her of clothing, shoes, blankets, and art supplies without notice.

207.    Being continuously swept by the City has been an immensely stressful experience for Ms. Hayes as she is afraid they are going to keep returning, potentially without notice, to take what little belongings she has left.

IV.    **Eduardo Ventura**

208.    Plaintiff Eduardo Ventura has been consistently homeless from in or around the end of 2020 through March 2025, and consistently street homeless from the Spring of 2022 through

48

December 2023.

209.    Mr. Ventura began experiencing regular sweeps beginning in or around May 2023 and very frequent sweeps in or around August 2023 at his sites in the East Village in Manhattan.

210.    Mr. Ventura experienced at least eighteen sweeps and/or scheduled sweeps at two different sites between August 2023 and December 2023: on or around August 8, August 16, August 28, September 5, September 12, September 19, September 23, September 26, September 27, October 2, October 11, October 19, October 26, November 7, November 17, November 22, November 29, and December 7, 2023.

211.    At each of his sites, Mr. Ventura stored his personal belongings in a few bags and/or containers and would position them on the edge of the sidewalk, at one of his sites, or against the side of a building, at his other site, so that they weren't impeding the sidewalk.

212.    During the first few months, the City usually provided Mr. Ventura with advance written notice of a sweep.

213.    On average, he would receive 24 to 48 hours' advance notice.  He never received more than 48 hours' notice of a sweep.  This did not give Mr. Ventura adequate time to find a safe location to relocate with his belongings.

214.    Typically, Mr. Ventura would be approached at his site by an interagency sweeps team, usually consisting of approximately two or three DHS employees, three DSNY employees, including a DSNY supervisor, and two to upward of ten NYPD officers.

215.    The NYPD officers would verbally instruct him to take only what he could carry in a single trip and leave the area.

216.    Mr. Ventura would comply with the officers' instructions to leave his site as he understood that if he did not, he would be arrested and/or the City would seize and destroy every

single belonging he had at his site.

217.    The City would not give Mr. Ventura a meaningful opportunity to pack up all of his belongings before they began seizing items. In the first few months, they would allow him to spend five to ten minutes packing up his belongings. However, after in or around August 2023 onward, they would make him leave the area almost immediately and would begin seizing any items he couldn't take with him within a couple minutes of arrival.

218.    During each sweep, the City would invariably seize and unlawfully destroy Mr. Ventura's personal property, including warm clothing, cell phones, blankets, items of sentimental value, and personal papers.

219.    On many occasions, Mr. Ventura witnessed DSNY employees seize his personal belongings and throw them in a sanitation truck. Sometimes, he would see them run the compactor and crush his belongings, including bicycles.

220.    Mr. Ventura would frequently assert ownership of the belongings that the City permanently destroyed and plead with the City not to dispose of his property. The City, however, ignored his verbal requests.

221.    The City never offered Mr. Ventura storage for his belongings or vouchered his property, nor did it ever offer him assistance with securing permanent housing.

222.    The only services that the City ever offered Mr. Ventura were transportation to a hospital or a congregate shelter placement.

223.    The City also never provided a post-deprivation process for reclaiming his property or offered to compensate Mr. Ventura for the property that they destroyed.

224.    On some occasions, after the sweeps team had concluded the sweep, several NYPD officers would remain at Mr. Ventura's site for up to thirty minutes, physically preventing him

from returning.

225.    Mr. Ventura also experienced sweeps without notice when he was absent from his site, running errands, using the bathroom, or walking around the neighborhood.  He would return to his site and find everything gone, which is how he understood that a sweep had taken place.  At his site, he would arrange his belongings in an organized and compact manner to indicate they belonged to someone.

226.    In or around the Summer of 2023, Mr. Ventura experienced a sweep during which the City seized and disposed of his Permanent Resident card, his New York State Identification Card, his New York State Driver's Permit, Medicaid card, passport, and his Occupational Safety and Health Administration ("OSHA") card, among other belongings.  The City did not leave a notice at his site explaining there had been a sweep and/or containing information about the seizure of his belongings.

227.    Mr. Ventura has been unable to replace his identification cards, with the exception of his Permanent Resident card.

228.    As a result, Mr. Ventura has had trouble applying for jobs and accessing certain government services.

229.    From in or around September or October 2023 onward, the City started to perform an increased number of no-notice sweeps and informed Mr. Ventura that they were no longer required to provide advance notice before conducting a sweep.

230.    In or around the end of 2023, Mr. Ventura experienced three or four devastating no-notice sweeps during which the City seized and destroyed almost all of his personal belongings, including clothing and bedding that he relied on to stay warm during the colder months.

231.    During one particular sweep, in or around October or November 2023, Mr. Ventura

was woken up by an inter-agency sweeps team and forced to leave his site immediately. He only had time to grab a small bag before the City started throwing his belongings into a sanitation truck. He was not permitted to take anything else with him, including bedding, clothing, heaters, a chair, and an electric bike. The City permanently deprived him of these items.

232.    The City swept Mr. Ventura on multiple occasions during inclement weather such as heavy rain and displaced him from his site where he had shelter from the elements, and/or destroyed personal belongings that he needed to survive. Being forced to relocate during heavy rain often meant that his clothing and belongings would get wet, which made it difficult to keep himself warm.

233.    The experience of being consistently swept by the City and losing all of his personal belongings has had a hugely traumatic impact on Mr. Ventura. It caused him to feel depressed as the City would take what little he had and force him to leave when he had nowhere else to go.

234.    In or around December 2023, Mr. Ventura obtained a placement in a shelter stabilization bed via his advocate at UJC-SNP and he resided there until March 2025.

235.    The City never offered Mr. Ventura a placement in a low-barrier shelter such as a Safe Haven or stabilization bed, and he wasn't aware that this was an option until his advocate from UJC-SNP informed him of the existence of these beds.

236.    Since the filing of the first complaint in this case, Mr. Ventura has obtained housing with the assistance of UJC-SNP social work and advocacy services. His housing, however, is subsidized with a CityFHEPS voucher which is inherently precarious. The law that creates the CityFHEPS program is subject to appropriations and is therefore subject to the availability of funds for the program. The City is currently anticipating cuts to Federal funding that will lead to reductions in the city budget for housing subsidies and other supports. Thus, the funding for Mr.

Ventura's housing could be cut and as such, he remains at risk of being subjected to unlawful sweeps again in the future.

## V.    <u>Damian Voorhees</u>

237.    Plaintiff Damian Voorhees has been street homeless in New York City for over six years.

238.    Mr. Voorhees primarily resides at two sites in the Lower East Side of Manhattan.

239.    Mr. Voorhees has experienced somewhere in the vicinity of 50 sweeps while street homeless and at least 20 sweeps in 2024 alone, including, but not limited to, on or around July 17, August 2 through August 6, August 8, August 15, September 11, September 24, October 8, October 18, and October 24, 2024.

240.    After being swept at least once per week in the months of June and July 2024, Mr. Voorhees experienced a high volume of no-notice sweeps in August 2024. He experienced daily sweeps over five consecutive days during the period from on or around August 2, 2024 through on or around August 6, 2024. With the exception of August 5, 2024, all of these sweeps were "emergency" sweeps conducted without prior notice.

241.    All the sweeps that Mr. Voorhees has experienced are largely conducted in the same way.

242.    When the City does provide advance written notice, they typically offer one to two days,' and on occasion three days, notice prior to a sweep.

243.    These sweeps are usually carried out by the NYPD, CDOT, SDOT, and/or DSNY, and DHS.[45] Typically, there are two NYPD officers present, but Mr. Voorhees has experienced

---

[45] Plaintiffs and class members are often unable to distinguish between CDOT and SDOT officers. Information obtained through FOIA demonstrates that both agencies have been involved in relevant sweeps, and SDOT has been involved in at least 632 relevant sweeps. As such,

sweeps where there have been as many as six to eight officers in attendance.

244.    Mr. Voorhees has also experienced a night-time sweep involving only the NYPD, in or around early September 2023, during which officers permanently seized all of his clothing and a tent.

245.    Mr. Voorhees stores most of his belongings in or adjacent to a wheely bin and in one or two suitcases and/or bags.  At his primary site on a bridge, he typically has a tarpaulin that he places over his belongings to indicate that they belong to someone and as protection from the sun and rain.  He positions his belongings in a way that does not obstruct pedestrian or car traffic.

246.    When sweeps teams arrive at Mr. Voorhees's site, they typically tell him to take what he can carry in one trip and go.  Sometimes, the City gives him only a few minutes to pack up his belongings before they begin seizing items and throwing them into a sanitation truck.

247.    NYPD officers instruct Mr. Voorhees to move along during sweeps.  He always complies with their orders because he is afraid that he will be arrested or ticketed if he does not comply.

248.    The City has permanently deprived Mr. Voorhees of his personal belongings during sweeps, including but not limited to, clothing, personal identification documents, bedding, tools, small appliances such as portable camping stoves, and cash.

249.    The City also seized and destroyed Mr. Voorhees's social security card, birth certificate, and New York State identification card during a sweep in 2023.  He has still not been able to replace the identification documents that the City destroyed.

250.    Mr. Voorhees repairs scooters and bicycles for people who reside in the local area.

---

Defendants John and Jane Doe SDOT officer effectuated those unlawful sweeps, pursuant to the direction of Defendant Dominguez.

The City has seized and destroyed scooters and bicycles, including during a sweep on or around August 15, 2024, which he received written notice of the day prior.  On another occasion, the NYPD refused to voucher bicycles and/or scooters in his possession and subsequently destroyed them.

251.    DHS has never vouchered or stored Mr. Voorhees' personal belongings during a sweep.  NYPD officers have offered to voucher and/or store his belongings on only one other occasion, during an "emergency" sweep in or around early August 2024, after he requested that they not dispose of his remaining belongings.  They ultimately did not voucher and/or store his belongings because they would not allow him to sort through or make an inventory of the items he intended to store.

252.    Mr. Voorhees has witnessed DSNY, SDOT, and/or CDOT workers operate the compactor while conducting a sweep and crushing his personal belongings.

253.    On July 17, 2024, the City conducted an emergency sweep without notice at his primary site during which they seized and destroyed any items he was unable to carry in a single trip, including power tools, clothing, plates, toiletries, and a tarpaulin.

254.    During a no-notice sweep on or around August 2, 2024, the City seized a suitcase containing Mr. Voorhees' clothing and disposed of it by throwing it into a sanitation truck.  There were approximately eight NYPD officers present during this sweep and they told him to pack up and leave immediately, taking only what we could carry in one trip.  The sweeps team gave him mere minutes to transport his belongings and he was unable to carry the suitcase along with his wheely bin.  When he returned to try to claim the suitcase, he saw that the City had already placed it in the sanitation truck, permanently depriving him of these belongings.

255.    On October 8, 2024, Mr. Voorhees was swept at his primary site on or around the

bridge by an interagency team consisting of representatives from the NYPD, CDOT, and DHS. The City posted a notice on October 5, 2024, however, he suspected that if he relocated to his secondary site, the City would sweep him there too.  During this sweep, the City permanently deprived him of important personal belongings, including a foam mattress and floor mat he used for sleeping, two bicycle wheels, and a bicycle trailer hitch that he was repairing.  An NYPD officer prohibited him from transporting these belongings because they described them as "ineligible" and, in response to protests that he needed his floor mat and mattress, told him that they were "going in the garbage."  The City forcibly seized these items and threw them in the back of a CDOT garbage truck before forcing Mr. Voorhees to leave his site.  The City did not offer him storage or a way to reclaim the belongings they took.  Rather, NYPD officers remained near his site overnight and have erected barricades to prevent him from returning.  A second sweeps team, involving the Parks Department, then immediately proceeded to sweep his secondary site in the nearby park.

256.    The City has conducted sweeps of Mr. Voorhees while it was snowing and permanently deprived him of warm coats.

257.    Mr. Voorhees has also experienced sweeps while temporarily absent from his site, during which the City has seized and destroyed his personal belongings despite him arranging them in a way that clearly indicates they belong to someone.  The City did not leave notices at his site regarding the sweep or seizure of his property.

258.    Sometimes, as was the case on September 11, 2024, in response to a sweeps notice instructing him to move his belongings and leave his site, Mr. Voorhees will pack up and relocate prior to the sweep to avoid having any belongings he cannot carry in a single trip being disposed of by the City.  This is time-consuming, as well as physically and psychologically demanding, for

Mr. Voorhees, and impedes his ability to engage in income-generating activities.

259.    In August and September 2024, the City posted three sweeps notices and then ultimately failed to arrive on the day of the scheduled sweeps, which meant that Mr. Voorhees was forced to repeatedly pack and unpack his belongings.

260.    Repeated sweeps have negatively impacted Mr. Voorhees' ability to sleep as he knows there is a risk that a sweeps team could arrive early in the morning and force him to relocate. On September 24, 2024, for example, Mr. Voorhees awoke at approximately 7:45 am to find a CDOT garbage truck parked near his site and the City subsequently proceeded to sweep him.

261.    Experiencing constant "emergency" or no-notice sweeps at the hands of the City means that Mr. Voorhees cannot take steps to prepare for sweeps and feels like he cannot leave his belongings unattended due to the real risk that the City will arrived unannounced and dispose of all of his personal property.

262.    City representatives have told him that they are going to carry out repeated sweeps until he finds somewhere else to go.

263.    Mr. Voorhees' has experienced psychological harm due to repeatedly being forced to relocate and having his personal belongings destroyed.

## VI.    **Abed Campos**

264.    Plaintiff Abed Campos has been street homeless in Lower Manhattan since September 2013.

265.    Since October 2018, Mr. Campos has resided at different sites South of Houston Street ("SoHo") in Lower Manhattan, including his current site.

266.    Mr. Campos's primary site is located under scaffolding in order to protect himself from harsh weather conditions such as wind, rain, and extreme heat. He typically keeps his belongings in a few cooler bags and stores them along the side of a building as to not block

pedestrian traffic, and keeps the area clean of debris.

267.    In his first year of living street homeless, Mr. Campos experienced regular sweeps every two weeks. From around September 2014 until the summer of 2021, Mr. Campos experienced sweeps anywhere from twice to thrice a month.

268.    In the winter of 2021, Mr. Campos experienced weekly sweeps—often without notice (averaging a total of about 12 sweeps).

269.    From the spring of 2022 until around the fall of 2024, Mr. Campos experienced bi-weekly sweeps—often without notice (averaging a total of about 60 sweeps).

270.    Since around the winter of 2024, Mr. Campos has experienced sweeps roughly every 10 days (averaging a total of about 20 sweeps).

271.    As a result of these regular sweeps, Mr. Campos now moves his site every 10 days in anticipation of sweeps so that he can avoid being swept and losing his personal belongings. He fears that if he does not move before a sweep, the NYPD will give him a ticket or arrest him.

272.    Before 2025, Mr. Campos experienced sweeps consistently with little to no prior notice. Mr. Campos's most recent no-notice sweep occurred in October 2024.

273.    When Mr. Campos did receive notice, it would typically be anywhere from 12 to 48 hours prior to a scheduled sweep. Other times, Mr. Campos would be unable to see sweeps notices that were posted at his site due to rain or other inclement weather destroying them.

274.    In the absence of notice, Mr. Campos would detect a sweep happening upon the arrival of a sweeps team driving up to his site. The team typically consists of about two to three NYPD officers, two DHS workers, and three to four DSNY workers.

275.    If he is not at his site at the time of the sweep, Mr. Campos understands that a sweep has happened when he returns to his site and finds all his belongings—i.e., every single item at his

site—gone. He had experienced habitual property deprivation of this nature in the first seven years or so of living street homeless. In a sweep that happened in the Spring of 2020, Mr. Campos lost a sweater and shorts he had newly purchased from Target.

276.    During one of his earlier sweeps around 2013 and 2014, Mr. Campos briefly stepped away from his site during a sweep to go to the pharmacy, he found all his belongings gone upon his return. Incidents like this used to happen at least once or twice a month.

277.    When Mr. Campos has advance notice of a sweep, he typically packs up his belongings and relocates to an alternate location to avoid interacting with the City—in particular the NYPD—and to safeguard his personal belongings.

278.    However, on multiple occasions when Mr. Campos has not had the opportunity to relocate in advance of a sweep—either due to receiving inadequate notice or no notice at all—the City has forcibly seized and destroyed his belongings during sweeps. In the process of doing so, the City has permanently deprived Mr. Campos of life-sustaining belongings, such as sleeping bags and the cardboard he uses as a mat on the concrete, as well as personal items including, but not limited to, clothing, bookbags, luggage, a radio, and clippers for shaving.

279.    The City has repeatedly restricted Mr. Campos to make only one trip during a sweep to transport his property to a new site, while they have destroyed any property of his left unattended for even a moment. On multiple occasions, the City has told Mr. Campos that he may only take one box of his belongings with him, or that because he had too much property, he was not allowed to take everything with him.

280.    For example, during a sweep that occurred in or around the Spring of 2020, Mr. Campos was unaware that a sweep was planned. This was, upon information and belief, most likely because the notice was not securely affixed to his site and was blown away by wind and rain.

During the sweep, Mr. Campos was able to pack all his belongings into two boxes. In compliance with the City's orders to move in one trip, Mr. Campos removed one box away from his site, immediately returning to find that his second box—containing jeans, shorts, sweaters, and more protective items—had been taken and disposed of in the City's sanitation truck.

281.    As such, Mr. Campos has lost precious financial resources to store his belongings to avoid having them seized by the City during sweeps. On one occasion, he paid a nearby dry cleaner to store his sleeping bag and clothes in preparation for an upcoming sweep. He cannot otherwise afford a proper storage facility costing $175.00.

282.    The City has never offered Mr. Campos storage for his belongings.

283.    Mr. Campos has been unable to replace many of the personal items he has lost during sweeps. For example, he cannot afford to replace items such as sleeping bags, forcing him to sleep on the concrete and without protection from severe weather and cold temperatures.

284.    As a result of the displacement and personal property loss Mr. Campos has experienced during multiple sweeps, without prior notice, he continues to live in constant fear of an impending sweep.

285.    Mr. Campos feels uncomfortable leaving his site, even for brief periods. This makes it difficult for Mr. Campos to apply for public benefits, such as food stamps and cash assistance, as he is fearful that he will return to find all his belongings removed and destroyed by the City.

286.    When Mr. Campos has to leave his site briefly to get food, water, and use a restroom facility, or access other necessities, he is forced to race back and forth from nearby shops as quickly as possible to avoid losing his property.

287.    Mr. Campos has difficulty sleeping due to his constant paranoia around the possibility of no-notice sweeps, as he has often experienced sweeps at early hours of the morning.

## CLASS ACTION ALLEGATIONS[46]

288.    The individual Plaintiffs seek to represent the following classes pursuant to Rule

23(b)(2) of the Federal Rules of Civil Procedure:

      a.    **The Property Class**: Every homeless person who has had and/or will have their personal belongings seized and/or destroyed by the City of New York and/or New York State during a "cleanup" of a homeless hotspot, popup, or encampment.

      b.    **The Forced Relocation Class**: Every homeless person who has been and/or will be forced to leave the place where they reside by the City of New York due to the City's policy and practice regarding a "cleanup" of a homeless hotspot, popup, or encampment.

289.    The members of the Property Class and the Forced Relocation Class are so

numerous as to render joinder impracticable.  The City of New York conducts thousands of sweeps

per year in every City borough, including at times with its partner agencies NYDOT and

NYCEDC.  According to data reported by DSS and DSNY, between October 2021 and June 2024,

the City conducted a minimum of 11,678 sweeps.[47]  As of January 2024, there were a reported

4,140 people experiencing street homelessness in New York City.  As stated above, the City does

not limit sweeps to "encampments;" sites classified as "hotspots" and "popups," which are very

broadly defined, are subject to sweeps.  Accordingly, the 4,140 individuals, a figure widely

considered to be an undercount, living unsheltered in New York City all reside at sites that have

---

[46] Plaintiffs reiterate that, where this complaint refers to "the City," that term includes the relevant City agencies and non-City "partner agencies," including SDOT and NYCEDC, who participate in the removal and destruction of homeless residents' belongings.

[47] This figure combines available DSS data from October 1, 2021, to August 25, 2023, with available DSNY data from August 26, 2023, to June 30, 2024.  Therefore, this figure does not capture the number of sweeps conducted by the City where other agencies (*i.e.*, Parks Department, CDOT, SDOT and/or NYCEDC) were the designated "cleaning partners" from August 26, 2023 to June 30, 2024.  Accordingly, it should be treated as a minimum number.

been and/or are likely to be swept by the City at any time.

290.    The City has a *de facto* policy of unlawfully seizing and destroying the personal belongings of homeless people during sweeps, and a written and *de facto* policy of displacing homeless people and forcing them to leave their sites during sweeps.  Given the number of individuals reported to be living unsheltered in New York City, the volume of sweeps carried out each year for the past three years, and the City's widespread practice of  destroying homeless residents' personal belongings and forcibly displacing them pursuant to its sweeps policy, there are clearly thousands of homeless New Yorkers affected by sweeps who fall into both the Property Class and Forced Relocation Class.

291.    In addition, UJC-SNP has worked with roughly 100 clients in the past three years who have experienced sweeps, had their personal belongings seized and destroyed, and been forcibly relocated.

292.    The class members share a number of questions of law and fact in common.

293.    For the Property Class, these include:

    a.    **<u>Unreasonable Seizure</u>**

        i.    Whether the City has meaningfully interfered with class members' possessory interests in their personal belongings; and

        ii.    Whether the City's meaningful interference with class members' possessory interests in their personal belongings was unreasonable.

    b.    **<u>Unreasonable Search</u>**

        i.    Whether the class members have a reasonable expectation of privacy in their personal belongings; and

        ii.    Whether the class members' reasonable expectation of privacy in their personal belongings outweighs any government interest in conducting warrantless searches of their personal belongings.

    c.    **<u>Procedural Due Process</u>**

i. Whether the City—when following its written policy—provides adequate notice to class members before seizing and destroying their personal belongings;

ii. Whether the City, in practice, follows its written policy of providing notice to class members before seizing and destroying their personal belongings;

iii. If not, whether the City's practice of providing different notice than in its written policy—or no notice at all—is so widespread as to constitute a *de facto* policy;

iv. Whether the City—when following its *de facto* policy of providing notice (or no notice)—provides adequate notice to class members before seizing and destroying their personal belongings;

v. Whether the City—when following its written policy—provides adequate post-deprivation process to class members before destroying their personal belongings;

vi. Whether the City, in practice, follows its written policy of providing post-deprivation process to class members before destroying their personal belongings;

vii. If not, whether the City's practice of providing different post-deprivation procedures than in its written policy—or no post-deprivation process at all—is so widespread as to constitute a *de facto* policy; and

viii. Whether the City—when following its *de facto* policy of not providing any post-deprivation process—provides adequate process to class members before destroying their personal belongings.

d. **Substantive Due Process – State-Created Danger**

i. Whether, by seizing and destroying the class members' personal belongings, the City has engaged in affirmative governmental conduct that has exposed and continues to expose class members to known and obvious dangers that they would not otherwise face; and

ii. Whether the City's actions exhibited a repeated, deliberate indifference to such obvious or known dangers for class members.

e. **Article XVII of the New York State Constitution**

i. Whether the class members are "needy" under Article XVII of the New York State Constitution;

ii.     Whether the City's conduct in permanently seizing and destroying the class members' personal belongings deprive the class members of the aid, care and support that the State is obligated to provide; and

iii.    Whether the deprivation of the class members' life-sustaining belongings is in pursuit of any legitimate governmental objective.

294.    For the Forced Relocation Class, these include:

a.    **Substantive Due Process**

i.     Whether the City has a legitimate purpose for consistently forcing the class members to relocate during sweeps;

ii.    Whether sweeps are narrowly tailored to serve a legitimate government purpose; and

iii.   Whether the City's sweeps significantly burdened Plaintiffs' freedom of movement.

b.    **Substantive Due Process – State-Created Danger**

i.     Whether, by forcibly displacing the class members, the City has engaged in affirmative governmental conduct that has exposed and continues to expose class members to known and obvious dangers that they would not otherwise face; and

ii.    Whether the City's actions exhibited a repeated, deliberate indifference to such obvious or known dangers for class members.

c.    **Bias-Based Profiling**

i.     Whether, by forcing the class members to leave their sites during sweeps, the City has initiated law enforcement action against them in reliance on their actual or perceived homelessness; or in the alternative

ii.    Whether, by forcing the class members to leave their sites during sweeps, the City is acting pursuant to a policy that created a disparate impact on homeless New Yorkers.

295.    Plaintiffs' claims are typical of those of both classes. Each class members' claims arise from the same course of events—namely, the City's homeless sweeps policy and implementation—and all of the class members will make similar legal arguments to prove defendant's liability—specifically, resolving the above common questions of law in their favor.

296.    The sweeps policy and implementation was directed at both the class representatives and the class members, and thus minor variations in the claims—such as minor variations in amount of notice, amount of items destroyed, etc.—do not defeat typicality.

297.    The legal theories under which Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by Plaintiffs are typical of the harms suffered by the class members.

298.    The class representatives will adequately protect the interests of the class. The class representatives' interests are not antagonistic to the interest of other members of the class.  Indeed, they are perfectly aligned.  And there is no conflict between the class representatives and the class they wish to seek, let alone a "fundamental" one.

299.    Plaintiffs are represented by Marika Dias of the Urban Justice Center – Safety Net Project ("UJC-SNP"); Siya Hegde of the National Homelessness Law Center ("NHLC"); and Luna Droubi and Keegan Stephan of the law firm Beldock Levine & Hoffman LLP ("BLH").

300.    UJC-SNP has provided direct legal services to thousands of low-income New Yorkers and has extensive experience working with homeless individuals. UJC-SNP has also litigated various group cases involving tenants and/or homelessness rights, including *117 West 141 LLC v. Michelle Pager, et. al.,* No. LT-308389-21 (N.Y. Civ. Ct. N.Y. Co. 2021), *In the Matter of the Application of Barry Simon v. Patrick J. Foye*, 2021 WL 2480059 (N.Y. Sup. Ct. N.Y. Cty. 2021), and *Albelo v. City of New York*, 2023 WL 4464109, N.Y. Slip Op. 32324(U) (N.Y. Sup. Ct. N.Y. Cty. 2023).

301.    Founded in 1989 as the National Law Center on Homelessness & Poverty, NHLC is a leading law and policy nonprofit charged with the mission to prevent and end homelessness in America. NHLC has established institutional expertise around the criminalization of homelessness

across litigation and policy advocacy spaces, as well as its written publications (including *Housing Not Handcuffs 2019: Ending the Criminalization of Homelessness in U.S. Cities*, which analyzes 187 city laws that effectively criminalize persons experiencing homelessness when they engage in critical, life-sustaining public activities). Recent cases in which the Law Center served as counsel of record include several class actions, including, but not limited to, *Martin v. Boise*, 920 F.3d 584 (9th Cir. 2019) (challenging the constitutional validity of ordinances that ban public sleeping and camping on behalf of persons experiencing unsheltered homelessness), *Singleton v. Taylor*, 2023 U.S. Dist. LEXIS 40560 (M.D. Ala., Aug. 25, 2021) (holding Alabama state laws that criminalized panhandling in public places unconstitutional under the First Amendment), and *Bloom v. City of San Diego*, 2024 U.S. Dist. LEXIS 47587 (S.D. Cal., Mar. 15, 2024) (challenging the ticketing the homeless people, many being people with disabilities, who were living in RVs and other vehicular encampments).

302.    BLH attorneys have litigated a number of class action lawsuits including, but not limited to *Syed v. City of New York*, 16-CV-04789 (S.D.N.Y.); *Elsayed v. City of New York et al.*, 18-CV-10566 (S.D.N.Y.); *Floyd v. City of New York*, 08-CV-1034 (S.D.N.Y.); *Daniels v. City of New York*, 198 F.R.D. 409 (S.D.N.Y. 2001) ("class counsel is undoubtedly qualified and experienced to conduct this litigation."); and *MacNamara v. City of New York*, 275 F.R.D. 125 (S.D.N.Y. 2011).

303.    Plaintiffs' counsel has the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

304.    The Plaintiff class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted on grounds generally applicable to the class,

thereby making class-wide declaratory and injunctive relief appropriate.

## CAUSES OF ACTION

### Count One
**42 U.S.C. § 1983, United States Constitution, Amendment IV**
**Unreasonable Seizure**
*Against the Individual Defendants (John and Jane Does 1-20)*

305.    By the acts and omissions described above, the Individual Defendants deprived Plaintiffs of their clearly established right be free of unreasonable seizures.

306.    The Individual Defendants' violations of that right caused Plaintiffs to suffer physical, mental, emotional, and economic damages.

### Count Two
**42 U.S.C. § 1983, United States Constitution, Amendment IV**
**Unreasonable Search**
*Against the Individual Defendants (John and Jane Does 1-20)*

307.    By the acts and omissions described above, the Individual Defendants deprived Plaintiffs of their clearly established right to be free of unreasonable searches.

308.    The Individual Defendants' violations of that right caused Plaintiffs to suffer physical, mental, emotional, and economic damages.

### Count Three
**42 U.S.C. § 1983, United States Constitution, Amendment XIV**
**Procedural Due Process**
*Against the Individual Defendants (John and Jane Does 1-20)*

309.    By the acts and omissions described above, the Individual Defendants deprived Plaintiffs of their clearly established right to procedural due process.

310.    The Individual Defendants' violations of that right caused Plaintiffs to suffer physical, mental, emotional, and economic damages.

**Count Four**
**42 U.S.C. § 1983, United States Constitution, Amendment XIV**
**Substantive Due Process, Right to Freedom of Movement and to Remain**
*Against the Individual Defendants (John and Jane Does 1-20)*

311.    By the acts and omissions described above, the Individual Defendants deprived Plaintiffs of their clearly established, substantive due process rights to freedom of movement and to remain.

312.    The Individual Defendants' violations of that right caused Plaintiffs to suffer physical, mental, emotional, and economic damages.

**Count Five**
**42 U.S.C. § 1983, United States Constitution, Amendment XIV**
**Substantive Due Process, State Created Danger**
*Against the Individual Defendants (John and Jane Does 1-20)*

313.    By the acts and omissions described above, the Individual Defendants deprived Plaintiffs of their clearly established, substantive due process rights to be free from state created danger.

314.    The Individual Defendants' violations of that right caused Plaintiffs to suffer physical, mental, emotional, and economic damages.

**Count Six**
**42 U.S.C. §1983, *Monell* Liability for Constitutional Violations**
*Against the Municipal Defendants*

315.    The Individual Defendants violations of Plaintiffs constitutional rights were a direct result of the City's unconstitutional policies and customs.

316.    The Municipal Defendants are thus liable for all of Plaintiffs' injuries that were caused by the Individual Defendants' violations of their constitutional rights.

**Count Seven**
***Ex Parte Young* Liability for Constitutional Violations**
*Against Defendant Dominguez*

317.    By the acts and omissions described above, Defendant Dominguez is liable for

68

violations of federal law.  Plaintiffs seek an injunction against Defendant Dominguez enjoining her from continuing to implement an unlawful policy and custom of enforcement.  Accordingly, Plaintiffs bring this action against Defendant Dominguez pursuant to *Ex Parte Young*.

**Count Eight**
**New York State Constitution, Article XVII**
**Duty to Aid the Needy**
*Against All Defendants*

318.    By the acts and omissions described above, Defendants violated their affirmative duty to provide Plaintiffs aid, care, and support by unlawfully depriving them of their life-sustaining belongings during sweeps, violating Plaintiffs rights under the laws of New York.

319.    Defendants' violations of that right caused Plaintiffs to suffer physical, mental, emotional, and economic damages.

**Count Nine**
**Bias-Based Profiling, N.Y.C. Admin. Code, § 14-151**
*Against the Individual and Municipal Defendants*

320.    By the acts and omissions described above, Defendants engaged in bias-based profiling against Plaintiffs by initiating law enforcement action against them in reliance on their actual or perceived homelessness, violating Plaintiffs' rights under the laws of New York.

321.    In the alternative, by the acts and omissions described above, Defendants engaged in bias-based profiling against Plaintiffs by acting pursuant to a policy or policies that created a disparate impact on homeless New Yorkers, violating Plaintiffs' rights under the laws of New York.

322.    Defendants' violations of that right caused Plaintiffs to suffer physical, mental, emotional, and economic damages.

## Count Ten
### Negligent or Intentional Infliction of Emotional Distress
*Against All Defendants*

323.    By the acts and omissions described above, Defendants engaged in extreme and outrageous conduct, which intentionally or negligently caused Plaintiffs to suffer severe emotional distress, causing them physical, mental, emotional, and economic damages, thus violating Plaintiffs statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

## Count Eleven
### Conversion
*Against All Defendants*

324.    By the acts and omissions described above, Defendants unlawfully converted Plaintiffs' property while conducting sweeps, causing them physical, mental, emotional, and economic damages, thus violating Plaintiffs statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

## Count Twelve
### Trespass to Chattels
*Against All Defendants*

325.    By the acts and omissions described above, Defendants unlawfully interfered with Plaintiffs' dominion over their personal property ("chattels") while conducting sweeps, causing them physical, mental, emotional, and economic damages, thus violating Plaintiffs' statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

## Count Thirteen
### *Respondeat Superior* Liability for State Law Violations
*Against the Municipal Defendants*

326.    The Individual Defendants' acts and omissions described above, which caused Plaintiffs physical, mental, emotional, and economic damages, occurred while the Individual Defendants were on duty and in uniform, in and during the course and scope of their duties and

70

functions as New York City employees, and while they were acting as agents and employees of Defendant City of New York, clothed with and invoking state power and authority.

327.    Defendant City of New York is thus liable for Plaintiffs' injuries under the state common law doctrine of *respondeat superior*.

**Count Fourteen**
**Negligent Hiring, Screening, Retention, Supervision, and Training**
*Against the Municipal Defendants*

328.    The Municipal Defendants negligently hired, screened, retained, supervised, and trained the Individual Defendants, whose acts and omissions described above caused Plaintiffs to suffer physical, mental, emotional, and economic damages and violated their statutory and common law rights as guaranteed by the Constitution and laws of the State of New York.

**RELIEF SOUGHT**

Plaintiffs demands judgment against all Defendants, individually and jointly, and pray for the following relief:

(a)    An order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, for the classes described above, with the named Plaintiffs as class representatives;

(b)    A class-wide declaratory judgment that the City of New York's policies and customs of conducting homeless sweeps violates the Fourth and Fourteenth Amendments to the United States Constitution, Article XVII of the New York State Constitution, Section 14-151 of the New York City Administrative Code, and New York State's Common Law principles of negligent infliction of emotional distress, intentional infliction of emotional distress, conversion, and trespass to chattels.

(c)    A permanent injunction enjoining the City of New York and the State of New York from conducting homeless sweeps or "cleanups," or similar policies or customs, in violation of the United States Constitution, Article XVII of the New York State Constitution, Section 14-151 of the New York City Administrative Code, and New York State's Common Law principles,  and specifically:

   (i)    Enjoining the City and the State from unlawfully searching, seizing, or converting, the personal belongings of class members, or threatening said

actions, during, before, or after sweeps; and

(ii)     Enjoining the City from unlawfully relocating class members, either temporarily or permanently, during, before, after, or in furtherance of sweeps.

(d)     Award named Plaintiffs compensatory damages in an amount that is fair and reasonable, to be determined at trial;

(e)     Award named Plaintiffs punitive damages in an amount to be determined at trial;

(f)     Award all Plaintiffs, including members of the Class, reasonable attorneys' fees, costs, and interest;

(g)     Any further or different relief the Court may deem just and proper.

Dated:  October 29, 2024                URBAN JUSTICE CENTER – SAFETY NET
        New York, New York              PROJECT

                                        _____
                                        Marika Dias
                                        40 Rector St, 9th Floor
                                        New York, NY 10006
                                        P: (646) 923-8357
                                        E: mdias@urbanjustice.org

                                        NATIONAL HOMELESSNESS LAW CENTER

                                        _____
                                        Siya U. Hegde
                                        1400 16th Street NW, Suite 425
                                        Washington, DC 20036
                                        P: (202) 638-2535, Ext. 105
                                        E: shegde@homelesslaw.org

                                        BELDOCK LEVINE & HOFFMAN, LLP

                                        _____
                                        Keegan Stephan
                                        Luna Droubi
                                        99 Park Avenue, PH/26th Floor

New York, New York 10016
P: (212) 277-5820
F: (212) 277-5880
E: kstephan@blhny.com

*Attorneys for Plaintiffs*